COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judge Alston and Senior Judge Frank
Argued at Norfolk, Virginia

PUBLISHED

JOHN PARIS STEVENS

OPINION BY
v.      Record No. 1926-17-1      JUDGE ROSSIE D. ALSTON, JR.
MAY 7, 2019

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Junius P. Fulton, III, Judge

J. Barry McCracken, Assistant Public Defender, for appellant.

Rosemary V. Bourne, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.

John Paris Stevens ("appellant") appeals his convictions for robbery, burglary of a bank

while armed, and use of a firearm in the commission of a felony, asserting that the Circuit Court

of the City of Norfolk ("trial court") erred by sustaining the Commonwealth's "reverse-Batson

challenge" (hereinafter "McCollum challenge") to one of his peremptory strikes. For the reasons

stated below, we disagree and affirm his convictions.

BACKGROUND[1]

On May 29, 2015, appellant entered a bank in the City of Norfolk, and after threatening a

teller with a firearm, demanded cash from the teller. The teller complied, and appellant left the

bank with a substantial amount of money. Appellant was indicted by a grand jury a few months

later, and his case was set for a jury trial.

---

[1] Only facts pertinent to appellant's assignment of error will be discussed in detail.

The initial venire panel of prospective jurors was comprised of 30 individuals. After the trial court granted several strikes for cause, 23 individuals remained.[2] The parties then exercised their peremptory strikes. After the Commonwealth struck multiple African-American jurors, appellant challenged the strikes pursuant to Batson v. Kentucky, 476 U.S. 79 (1986) (hereinafter "Batson challenge"). The trial court overruled appellant's Batson challenges, stating that the Commonwealth had "articulated [] racially neutral reason[s] in terms of trial strategy."[3]

Defense counsel had used all five peremptory strikes on Caucasian jurors. The Commonwealth objected to these strikes through a McCollum challenge, stating that "they're all white individuals, some of whom said nothing when they were questioned, or virtually nothing." Defense counsel immediately tendered a race-neutral explanation for each strike. At issue in this appeal is counsel's explanation regarding Juror #1.[4] Regarding Juror #1, defense counsel stated

> [w]e got nothing. We got no response from her whatsoever. We saw her sitting. She seemed to be paying attention, looking, listening to what everyone was saying and those kind of things. But mostly we struck number 1 because we couldn't get a read on her one way or the other. In terms of the scientific evidence question, she just did not respond. So we had some things we liked about some other folks, but we didn't know anything about her, so we struck her because of her lack of a response.

---

[2] The record does not provide a comprehensive statement of the demographics of the venire. For purposes of the analytical framework for this appeal, this absence has no effect, but it could certainly be relevant in other cases.

[3] The trial court's ruling on appellant's Batson challenges is not before us.

[4] Defense counsel's reasons for striking the other Caucasian jurors included that one "was giving dirty looks to [appellant]," one had served on a jury a few weeks prior and it was unknown how he had voted, another was familiar with the investigating detective, and another had a close relative in the Norfolk Sheriff's Department. The trial court overruled the Commonwealth's McCollum challenge to each of these jurors.

The Commonwealth responded that multiple prospective African-American jurors had exhibited the same behavior, and asserted that defense counsel's race-neutral explanation for the strike was pretextual.

Defense counsel further explained that he struck Juror #1 because

> [t]he demeanor issue was a lack of any kind of response to any of the questions that we asked. I didn't see any facial expressions or anything of that nature. I got to say she seemed to be paying attention, but I just couldn't tell, because I couldn't get a read on her. She didn't respond one way or another to any of the questions that we were asking. When other folks responded, her demeanor was unreadable. Couldn't tell one way or the other if she was engaged or not engaged. She seemed to be paying attention because her eyes were open. She was awake. She was moving her head around and looking at things, but judge, I just could not tell if she was really engaged in the process or not because of a lack of response.

After considering the arguments, the trial court ruled that defense counsel's strike of Juror #1 was improper and restored Juror #1 to the venire panel. The trial court reasoned "that none of the questions were directed to her specifically" and that "she did not give nonverbal queues [sic] by her demeanor."[5]

A trial on appellant's charges was held and ultimately the jury convicted appellant, and this appeal followed.

Before we turn to an analysis of appellant's arguments, a thorough review of Batson's historical underpinnings and progeny, as well as its importance in safeguarding the fairness of the jury trial, is warranted.

---

[5] The trial court also stated that it declined "to find that's a sufficient reason to strike her for cause." It is clear from the record that the discussion on the issues presented was related to appellant's peremptory strikes. This misstatement is germane to the second aspect of appellant's assignment of error.

A. *The Origins and Fundamental Aspects of the Jury Trial*

No comprehensive discussion of the circumstances relating to the underpinnings of a fair criminal jury trial can begin without understanding its foundations. The right to a trial by jury in a criminal proceeding finds its roots in early English common law. See Swain v. Alabama, 380 U.S. 202, 212-14 (1965); see also 4 William Blackstone, Commentaries, *349 (recognizing that "[t]he right of trial by jury . . . is a trial by the peers of every Englishman, and is the grand bulwark of his liberties, and is secured to him by the Great Charter"). As with many other rights and provisions derived from English customs, the Framers of the Constitution placed paramount importance on the individual's right to a trial by a jury of his peers. See Crawford v. Washington, 541 U.S. 36, 67 (2004).[6]

The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime" occurred. U.S. Const. amend. VI. Attorneys engage in a process called *voir dire*, essentially translated as "to speak the truth," wherein potential jurors are questioned about their ability to be fair and impartial. In Virginia, Code § 19.2-262 provides that a jury in a felony trial shall be comprised of 12 people, selected from a venire panel of "not less than 20."

During *voir dire*, the parties and the trial judge both question the venire of prospective jurors, and the parties strike prospective jurors "for cause" if "the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424 (1984); see also Code § 8.01-358; Rule

---

[6] The Framers "knew that judges, like other government officers, could not always be trusted to safeguard the rights of the people; the likes of the dread Lord Jeffreys [the notorious 'hanging judge'] were not yet too distant a memory. They were loath to leave too much discretion in judicial hands." Crawford, 541 U.S. at 67 (citing the Sixth and Seventh Amendments to the United States Constitution).

3A:14.  Then, the parties exercise their peremptory strikes to remove individuals from the venire that they believe will be biased toward or less sympathetic to their case.  Peremptory strikes also find their origins in English law.  See 4 Blackstone, supra, at *336, *348 (quoting a 1531 statute which stated that "no person, arraigned for felony, can be admitted to make any more than twenty peremptory challenges").  A peremptory strike is utilized "not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise."  Swain, 380 U.S. at 219.

Voir dire undeniably constitutes a vitally important component of the jury system.  That vital component, however, has long been prone to certain abuses, some so severe that they threatened to permanently taint the fabric of our nation's judicial system, and risked irreversibly undermining public confidence in its fairness.  Today, our judicial system embraces the fundamental principle that the accused has "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria."  Batson, 476 U.S. at 85-86 (citing Martin v. Texas, 200 U.S. 316, 321 (1906); Ex parte Virginia, 100 U.S. 339, 344-45 (1879)); see also Thiel v. Southern Pac. Co., 328 U.S. 217, 227 (1946) (Frankfurter, J., dissenting) (recognizing that an individual's race "simply is unrelated to his fitness as a juror").  The juror discrimination test enunciated in Batson – the Batson challenge – is an important, prophylactic safeguard.  However, it took a number of legal developments to establish it.

B.  *Discrimination in Jury Selection and the Early Efforts at Eradication*

While society clings to the notion that "[o]ur Constitution is colorblind, and neither knows nor tolerates classes among citizens," Plessy v. Ferguson, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting), it is imperative that we acknowledge our country's past horrific conduct and contempt towards African-Americans.  See, e.g., Virginia v. Black, 538 U.S. 343, 352-57

(2003) (noting that various forms of violence, including flogging, murder, and cross burning, were utilized as methods to intimidate African-Americans who sought integration and participation in the political process); Loving v. Virginia, 388 U.S. 1, 11 n.11 (1967) (recognizing that the statutory "prohibit[ion against] only interracial marriages involving white persons," while permitting African-Americans and other "nonwhite[s]" to "intermarry without statutory interference," "demonstrate[d] that the racial classifications" were unconstitutional "measures designed to maintain White Supremacy"); Brown v. Bd. of Educ., 347 U.S. 483, 490 (1954) (observing that "[e]ducation of [African-Americans in the South] was almost nonexistent . . . [and] was forbidden by law in some states").

Even after the end of the Civil War, the ratification of the Civil War Amendments, and the efforts of Reconstruction, African-Americans regularly experienced extensive forms of hateful discrimination, both abstract and direct. Southern state legislatures, refusing to accept the outcome of the Civil War, engineered vast schemes of laws and regulations that hindered the advancement of the African-American people. Today, we colloquially refer to these as Jim Crow laws – discriminatory tactics specifically designed to minimize the status of the African-American people in nearly all areas of society, most notably the "separate but equal" concept applied to public facilities, transportation, and schools. See Boynton v. Virginia, 364 U.S. 454, 462-63 (1960) (holding that segregation in public bus terminals is unlawful); Brown, 347 U.S. at 495 (holding that segregation in public education is unconstitutional); Simkins v. City of Greensboro, 246 F.2d 425, 426 (4th Cir. 1957) (per curiam) (enjoining segregation of a public golf course); Willis v. Pickrick Rest., 231 F.Supp. 396, 401-02 (N.D. Ga. 1964) (enjoining restaurant owner from refusing service to African-Americans). Another way of thwarting the rights of African-Americans was to preclude them from serving on juries.

In 1879, shortly after the end of Reconstruction and at the dawn of the Jim Crow era, an African-American man named Taylor Strauder challenged his murder conviction, asserting a violation of his Fourteenth Amendment right to equal protection after an all-white jury had sentenced him to death. Strauder v. West Virginia, 100 U.S. 303, 304 (1880). West Virginia by statute had established that "[a]ll white male persons who are twenty-one years of age and who are citizens of this State shall be liable to serve as jurors, except as herein provided." 1872-73 W. Va. Acts 102. Because no other statute existed governing the composition of juries, this allowed only for the possibility of an all-white male jury in every criminal trial. See Strauder, 100 U.S. at 305. Suspecting that the jury's racial homogeneity had unfairly deprived him of a fair trial, Strauder appealed the matter to the United States Supreme Court, which granted *certiorari*.

In its analysis in Strauder, the Supreme Court directly addressed the Fourteenth Amendment's purpose and intent, holding that "[i]t was designed to assure to the [African-American] race the enjoyment of all the civil rights that under the law are enjoyed by white persons, and to give to that race the protection of the general government . . . whenever it should be denied by the States." Id. at 306. In identifying those protections, the Court determined that the Fourteenth Amendment granted African-Americans a "positive immunity," which it defined as, "the right to exemption from unfriendly legislation against them distinctively . . . implying inferiority in civil society." Id. at 307-08.

Based upon that standard, the Court concluded that the blatantly discriminatory nature of the West Virginia statute "amount[ed] to a denial of the equal protection of the laws to [an African-American] man when he is put upon trial for an alleged offence against the State." Id. at 310. Strauder represented a pivotal first step in "the Court's unceasing efforts to eradicate racial discrimination in the procedures" to select a jury. Batson, 476 U.S. at 85.

The next significant case addressing discrimination in jury selection occurred during another particularly tumultuous time in our nation's history. In 1965, the Supreme Court decided Swain v. Alabama, one year after the enactment of the Civil Rights Act of 1964 and during the height of the civil rights movement which captivated the 1960s.

In Swain, the Court began by tracing the legal history of racial discrimination in jury selection following its decision in Strauder more than 80 years earlier.[7] Swain, 380 U.S. at 205. The first issue in Swain involved a challenge to Alabama's procedure for compiling its jury lists. Id. The Alabama statute at that time provided that "jury rolls" would be comprised of "all male citizens in the community over 21 who are reputed to be honest, intelligent men and are esteemed for their integrity, good character and sound judgment." Ala. Code, Tit. 30, §§ 20, 21 (1958). Each jury roll contained approximately 2,500 names, and then a commissioner would create jury lists of "qualified" individuals, drawing from a variety of sources such as "city directories, registration lists, club and church lists, conversations with other persons in the community, both white and [African-American], and personal and business acquaintances." Swain, 380 U.S. at 207. The "[v]enires drawn from the jury box made up in this manner unquestionably contained a smaller proportion of the [African-American] community than of the white community." Id. at 208. However, the Court hesitated to declare that these venire panels were the result of purposeful discrimination, commenting that the process "was somewhat

---

[7] The Court identified several cases that had continued to develop this area of law but had not endeavored to craft a remedy for the issue. See Carter v. Texas, 177 U.S. 442, 447 (1900) (extending the reasoning of Strauder to grand juries); Smith v. Texas, 311 U.S. 128, 130 (1940) (stating that racial discrimination in jury service "is at war with our basic concepts of a democratic society and a representative government"); Cassell v. Texas, 339 U.S. 282, 286 (1950) (noting that jurors are evaluated "on the basis of individual qualifications, and not as members of a race"); Hernandez v. Texas, 347 U.S. 475, 478 (1954) (extending the reasoning of Strauder to "other groups which need the same protection").

haphazard and little effort was made to ensure that all groups in the community were fully represented." Id. at 209.

The second issue raised in Swain was a direct precursor to the crux of Batson – specifically, whether the prosecution violated the Fourteenth Amendment because it exercised its peremptory strikes on all six African-Americans in the venire panel. Id. at 210. Although the issue was squarely before the Court, the Court resolved the matter on a technicality, stating that an insufficient record precluded it from evaluating the claim. Id. at 224. Instead, the Court opined that in future cases, a "Fourteenth Amendment claim takes on added significance" if, "in case after case," it is shown that the prosecution had systematically removed African-Americans who otherwise seem qualified to serve as jurors. Id. at 223. The Court wrote:

> [i]f the State has not seen fit to leave a *single* [African-American] on *any* jury in a criminal case, the presumption protecting the prosecutor *may* well be overcome. Such proof *might* support a reasonable inference that [African-Americans] are excluded from juries for reasons wholly unrelated to the outcome of the particular case on trial and that the peremptory system is being used to deny the [African-American] the same right and opportunity to participate in the administration of justice enjoyed by the white population.

Id. at 224 (emphasis added).

The Court concluded that "the defendant must, to pose the issue, show the prosecutor's *systematic use* of peremptory challenges against [African-Americans] *over a period of time*" and that the defendant must also "*establish on the record* the prosecutor's conduct in this regard, especially where the *same prosecutor for many years* is said to be responsible for this practice *and is quite available for questioning on this matter*." Id. at 227-28 (emphasis added). The Court held that Swain's claim failed despite acknowledging "that there ha[d] not been [an African-American] on a jury in Talladega County since about 1950." Id. at 226.

The extraordinarily difficult and amorphous threshold imposed by Swain ultimately proved ineffectual in curtailing the pervasive nature of the problem. The Supreme Court later described Swain's standard as "difficult to the point of unworkable." Miller-El v. Dretke, 545 U.S. 231, 239 (2005). One Massachusetts court pronounced the defendant's burden as "Sisyphean" (as in a task that can never be completed), Commonwealth v. Soares, 387 N.E.2d 499, 509 n.10 (Mass. 1979), and in another case, the Second Circuit characterized it as "Mission Impossible," McCray v. Abrams, 750 F.2d 1113, 1120 (2d Cir. 1984).

As such, Swain's methodology became an untenable response to discrimination against African-American jurors.

### C. Batson v. Kentucky

After recognizing the deficiencies of Swain, the Supreme Court decided the case which currently serves as the guidepost for eradicating racial discrimination in jury selection, in which it reevaluated "the evidentiary burden" that Swain required of criminal defendants. Batson, 476 U.S. at 82.

James Batson was charged with burglary and receiving stolen goods, and at his jury trial, the prosecutor used peremptory strikes on the only four African-Americans in the venire panel. Id. at 82-83. Batson's attorney requested a mistrial on the grounds that the prosecution's peremptory strikes violated Batson's Sixth and Fourteenth Amendment rights. Id. at 83. The trial court denied the motion, stating that parties may use peremptory strikes to "strike anybody they want to." Id. at 83. Batson appealed to the Supreme Court of Kentucky, and lost, having failed to conquer the Everest-like standard defined in Swain. Id. at 83-84.

In reading Batson, it is quite clear that the Supreme Court had long-desired to reconsider Swain. In the majority opinion consisting of six justices, Justice Powell declared unequivocally that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on

account of their race or on the assumption that [African-American] jurors as a group will be unable impartially to consider the State's case against [an African-American] defendant." Id. at 89. The Court recognized that "Swain ha[d] placed on defendants a crippling burden of proof, [rendering] prosecutors' peremptory challenges . . . largely immune from constitutional scrutiny." Id. at 92-93.

To address the problem in Swain, the Court relied upon a recent precedent in which it had held that "a consistent pattern of official racial discrimination" was not necessary to establish a Fourteenth Amendment violation, reasoning that "[a] single invidiously discriminatory governmental act" should not be "immunized by the absence of such discrimination in the making of other comparable decisions." Id. at 95-96 (quoting Vill. of Arlington Heights v. Metro. Hous. Dep't Corp., 429 U.S. 252, 266 n.14 (1977)).[8] The Court definitively overruled Swain, holding that "a defendant may make a *prima facie* showing of purposeful racial discrimination in selection of the venire by relying solely on the facts concerning its selection *in his case*." Id. at 95 (emphasis in original).

### D. The Batson Challenge: A Legal Process

Once the Court eliminated the problematic Swain standard, it articulated the multi-step process that courts now commonly refer to as the Batson challenge, and its implication in the use of preemptory strikes. We address each step in detail.

#### 1. Step One: The Defendant Makes a *Prima Facie* Case of Discrimination

"To establish a [*prima facie*] case, the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." Id. at 96 (internal citation omitted). Next,

---

[8] The Court also highlighted several other post-Swain decisions that had contributed to the formulation of the factors that would encompass the Batson challenge itself. 476 U.S. at 93-96.

- 11 -

"the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude [those members] . . . on account of their race." Id.[9]

Additionally, we note that the principle is no longer confined to that factual scenario and a Batson challenge is viable in a number of other circumstances. See, e.g., J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 129 (1994) (holding that Batson also applies to gender-based discrimination); Edmonson v. Leesville Concrete Co., 500 U.S. 614, 630 (1991) (holding "that courts must entertain a [Batson] challenge . . . in a civil trial"); Powers v. Ohio, 499 U.S. 400, 416 (1991) (holding that "race is irrelevant to a defendant's standing to object to the discriminatory use of peremptory challenges").

## 2. Step Two: The Burden Shifts

"Once the defendant makes a *prima facie* showing, the burden shifts to the [prosecution]," to respond "with a neutral explanation for challenging [African-American] jurors." 476 U.S. at 97. Specifically, the prosecution "must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenge[]." Id. at 98 (quoting Texas Dep't of Cmt'y Affairs v. Burdine, 450 U.S. 248, 258 (1981)).

"[T]he prosecutor may not rebut the defendant's *prima facie* case of discrimination by stating merely that he challenged jurors of the defendant's race . . . [on the basis] that they would be partial to the defendant because of their shared race." Id. at 97. "Nor may the prosecutor

---

[9] We also note that a Batson challenge remains viable even if "Step One" is not completed and a party does not put forth a *prima facie* case of racial discrimination – if the opposing party immediately jumps to "Step Two" and articulates a race-neutral explanation, the issue is moot. See Barksdale v. Commonwealth, 17 Va. App. 456, 459 (1993) (*en banc*). The Supreme Court of Virginia has ruled that the defect "was waived and became irrelevant" when the party "undertook to articulate reasons for [a strike] without first raising the procedural issue" to the trial court. Faison v. Hudson, 243 Va. 397, 402 (1992) (citing U.S. v. Lane, 866 F.2d 103, 105 (4th Cir. 1989)).

rebut the defendant's case merely by denying that he had a discriminatory motive or 'affirm[ing] his good faith in making individual selections.'" Id. at 98 (quoting Alexander v. Louisiana, 405 U.S. 625, 632 (1972)).  Instead, the "neutral explanation [must be] related to the particular case to be tried."  Id.

### 3.  Step Three:  The Defendant May Argue Pretext

Finally, the defendant, relying upon "all relevant circumstances," may argue that the prosecutor's neutral explanation is pretextual.  Miller-El, 545 U.S. at 240 (quoting Batson, 476 U.S. at 96-98).[10]  The Court was concerned that "Batson's individualized focus came with a weakness of its own owing to its very emphasis on the particular reasons a prosecutor might give."  Id.  For "[i]f any facially neutral reason sufficed to" undermine the defendant's claim, "then Batson would not amount to much more than Swain."  Id.[11]

---

[10] Although "Step Three" is not explicitly described within Batson, the Court felt compelled to remedy the problematic jurisprudence of the late 1980s and early 1990s, which "consist[ed] of a torrent of decisions restricting the application of Batson, finding Batson challenges to have been waived, or finding Batson challenges to have been without merit under the restrictive applications of Batson established by the circuit courts."  Mikal C. Watts & Emily C. Jeffcott, A Primer on Batson, Including Discussion of Johnson v. California, Miller-El v. Dretke, Rice v. Collins, & Snyder v. Louisiana, 42 St. Mary's L.J. 337, 341-42 (2011).

This development also came in response to Hernandez v. New York, 500 U.S. 352 (1991), a splintered decision in which the Court tangled the level of specificity required in the prosecution's race-neutral explanation.  See Hernandez, 500 U.S. at 360.  One justice characterized Hernandez as making "the surprising announcement that any neutral explanation, no matter how 'implausible or fantastic,' even if it is 'silly or superstitious,' is sufficient to rebut a *prima facie* case of discrimination."  Purkett v. Elem, 514 U.S. 765, 775 (1995) (*per curiam*) (Stevens, J., dissenting).

[11] The Court thus strengthened the safeguard of Batson and removed any remaining similarity with Swain, recognizing that "[s]ome stated reasons are false, and although some false reasons are shown up within the four corners of a given case, sometimes a court may not be sure unless it looks beyond the case at hand."  Miller-El, 545 U.S. at 240.  "A Batson challenge does not call for a mere exercise in thinking up any rational basis.  If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false."  Id. at 252.

4.  The Trial Court Assesses the Issues Joined

At this point in the Batson inquiry, the trial court, in considering whether the defendant has established racial discrimination, "should consider all relevant circumstances," including but not limited to, "a 'pattern' of strikes against [African-American] jurors," or "the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges." Batson, 476 U.S. at 96-97.  In other words, the trial court is not limited in what it could potentially identify as sufficient evidence of racial discrimination.  See Johnson v. California, 545 U.S. 162, 169 (2005).

E.  Georgia v. McCollum – *The Prosecution's Derivative Constitutional Right*

The Supreme Court has further ruled that the prosecution is entitled to claim that a criminal defendant has impermissibly applied his peremptory strikes.  See Georgia v. McCollum, 505 U.S. 42, 55-56 (1992).  In McCollum, the Court held that a criminal defendant violates the Constitution if he engages in purposeful racial discrimination when striking jurors.  Id. at 59.

In reaching that holding, the Court found it necessary to address four questions –
(1) whether a criminal defendant's discriminatory use of peremptory strikes causes the same damage that Batson sought to eradicate; (2) whether a criminal defendant's use of peremptory strikes "constitutes state action"; (3) whether the prosecution has standing to raise a challenge; and (4) whether allowing the prosecution to utilize the Batson process is superseded by a criminal defendant's constitutional rights.  Id. at 48.

On question one, the Court recognized that "only one" of Batson's goals was safeguarding a *defendant's* exposure to discrimination in the selection of his jury and that "denying a *person* participation in jury service on account of his race unconstitutionally discriminates against the excluded juror."  Id. (citations omitted) (emphasis added).  Although an individual possesses no inherent right to sit on a jury in a particular case, "he or she does possess

- 14 -

the right not to be excluded from one on account of race." Id. at 48-49 (quoting Powers, 499 U.S. at 409). The Court determined that the same harm addressed in Batson was also present, for "in all cases, the juror is subjected to open and public racial discrimination." Id. at 49. In so finding, the Court highlighted that "[t]he need for public confidence is especially high in cases involving race-related crimes," for "emotions in the affected community will inevitably be heated and volatile." Id.

Turning to the second question, the Court first noted that "[r]acial discrimination, although repugnant in all contexts, violates the Constitution only when it is attributable to state action." Id. at 50 (citing Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 172 (1972)). Thus arose the unusual inquiry of whether a criminal defendant's use of a peremptory strike is a "state action" for purposes of an Equal Protection Clause analysis. Id. In answering in the affirmative, the Court primarily relied upon Edmonson v. Leesville Concrete, in which it extended Batson to civil actions and had considered whether a private party may be considered a state actor. Id. at 50-51. The Court reasoned that because peremptory strikes find their basis in state authority, as they are conferred either by statute or common law and not by the Constitution, an individual's constitutional deprivation resulting from a peremptory strike can, in essence, be traced to the state. Id. at 51. The Court stated that when a defendant uses a peremptory strike to form a jury, he "is wielding the power to choose a quintessential governmental body . . . on which our judicial system depends." Id. at 54. Thus, the Court concluded that a criminal defendant, having been vested with "the power to choose the government's employees or officials," is "bound by the constitutional mandate of race neutrality." Id. (quoting Edmonson, 500 U.S. at 625).

In question three, the Court considered whether the prosecution has standing to challenge a defendant's allegedly discriminatory strikes. Id. at 55. The Court reasoned that it does, determining that the government suffers a cognizable injury if "the fairness and integrity of its

own judicial process is undermined" and that "[a]s the representative of all its citizens, the State is the logical and proper party to assert the invasion of the constitutional rights of the excluded jurors in a criminal trial." Id. at 56. The Court bolstered this conclusion by referencing the "daunting" obstacles facing an excluded juror should he or she independently seek legal recourse. Id.

Finally, with regard to question four, the Court held that the protections sought by Batson are not weakened by allowing the prosecution to question the peremptory strikes of a criminal defendant. Id. at 57-58. The Court reasoned that determining otherwise would "undermine the contribution of the peremptory challenge to the administration of justice." Id. at 57. According to the Court, "if race stereotypes are the price for acceptance of a jury panel as fair," that "price is too high to meet the standard of the Constitution." Id. (quoting Edmonson, 500 U.S. at 630). As such, the Court held that defense attorneys are limited to "legitimate, lawful conduct." Id. (quoting Nix v. Whiteside, 475 U.S. 157, 166 (1986)).

Accordingly, in a McCollum challenge, the prosecution may use the Batson process to remedy alleged discrimination in a defendant's peremptory strikes.

ANALYSIS

This Court has recently re-emphasized the deference given to trial courts in matters of jury selection, reasoning that it "stems from [the appellate court's] recognition that 'a trial judge who personally observes a juror, including the juror's tenor, tone, and general demeanor, is in a better position than an appellate court to determine whether a particular juror should be stricken.'" Hopson v. Commonwealth, 52 Va. App. 144, 151 (2008) (quoting Teleguz v. Commonwealth, 273 Va. 458, 475 (2007)). The "trial court has a pivotal role in evaluating . . . not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike." Snyder v.

- 16 -

Louisiana, 552 U.S. 472, 477 (2008).[12]  Thus, the issue of whether a defendant establishes

purposeful discrimination "turns on factual determinations."  Foster v. Chatman, 136 S. Ct. 1737,

1747 (2016).  "Appellate judges cannot on the basis of a cold record easily second-guess a trial

judge's decision about likely motivation."  Davis v. Ayala, 135 S. Ct. 2187, 2201 (2015)

(quoting Rice v. Collins, 546 U.S. 333, 343 (2006) (Breyer, J., concurring)).  For those reasons,

we will not reverse the trial court unless its decision was "clearly erroneous."  Avent v.

Commonwealth, 279 Va. 175, 196 (2010) (quoting Jackson v. Commonwealth, 266 Va. 423, 437

(2003)).

Appellant contends that the trial court erred in sustaining the Commonwealth's

McCollum challenge to defense counsel's peremptory strike of Juror #1, and further that the trial

court applied an incorrect legal standard in its ruling.

To argue a McCollum challenge, the Commonwealth assumes the role of the defendant in

a standard Batson challenge, and

> must make a *prima facie* showing that the peremptory strike was
> made on racial grounds.  At that point, the burden shifts to the
> [defendant] to produce race-neutral explanations for striking the
> juror.  The [Commonwealth] may then provide reasons why the
> [defendant's] explanations were pretextual and the strikes were
> discriminatory regardless of the [defendant's] stated explanations.
> Whether the [Commonwealth] has carried [its] burden of proving
> purposeful discrimination in the selection of the jury is then a
> matter to be decided by the trial court.

Jackson, 266 Va. at 436 (citing Buck v. Commonwealth, 247 Va. 449, 450-51 (1994)).

In accordance with the Batson steps, we first consider "Step One" and determine whether

the Commonwealth established a *prima facie* case.  Here, the Commonwealth established a

---

[12] With that responsibility, it is *imperative* for trial courts to ensure that the record in these cases is clear, well-developed, and that they deliver their rulings explicitly.  See Snyder, 552 U.S. at 479-86 (wherein the Court refused to defer to a trial court's credibility determination because the trial court had failed to provide a specific ruling on the record).

*prima facie* case when it alerted the trial court of its intent to challenge appellant's peremptory strikes, stating that "they're all white individuals, some of whom said nothing when they were questioned, or virtually nothing." The Commonwealth highlighted that all five of appellant's peremptory strikes were applied to Caucasian jurors, thus raising an inference that the strikes were racially motivated.[13]

"Step Two," a critical juncture of <u>Batson</u>, requires that the challenged party, in this case appellant, "produce race-neutral explanations for striking the juror." <u>Jackson</u>, 266 Va. at 436. Here, appellant argued to the trial court that he struck Juror #1 because

> [w]e got nothing. We got no response from her whatsoever. We saw her sitting. She seemed to be paying attention, looking, listening to what everyone was saying and those kind of things. But mostly we struck number 1 because we couldn't get a read on her one way or the other. In terms of the scientific evidence question, she just did not respond. So we had some things we liked about some other folks, but we didn't know anything about her, so we struck her because of her lack of a response.

Finally, in "Step Three," the Commonwealth argued that appellant's purported race-neutral explanation was pretextual. The Commonwealth contended that multiple other prospective jurors, all of whom were African-American, had exhibited demeanor and responsiveness identical to that of Juror #1, casting doubt upon the legitimacy of appellant's race-neutral explanation. Appellant responded, stating

> [t]he demeanor issue was a lack of any kind of response to any of the questions that we asked. I didn't see any facial expressions or anything of that nature. I got to say she seemed to be paying attention, but I just couldn't tell, because I couldn't get a read on her. She didn't respond one way or another to any of the questions that we were asking. When other folks responded, her demeanor was unreadable. Couldn't tell one way or the other if she was

---

[13] It is important to reiterate that to assert that a <u>Batson</u> or <u>McCollum</u> challenge is deficient on the grounds that the opposing party did not put forth a sufficient *prima facie* case, the striking party must not proceed directly to "Step Two," but rather must demand that "Step One" be consummated at that moment. <u>See</u> <u>Barksdale</u>, 17 Va. App. at 459; <u>see also</u> <u>supra</u> n.9 and accompanying text.

- 18 -

engaged or not engaged.  She seemed to be paying attention because her eyes were open.  She was awake.  She was moving her head around and looking at things, but judge, I just could not tell if she was really engaged in the process or not because of a lack of response.

Through that statement, appellant in essence rephrased his first explanation without providing new information or insight.

The trial court determined that appellant's strike of Juror #1 was improper, reasoning that Juror #1's non-responsiveness was probably the result of the fact that no question was ever directed to her individually.  Significantly, appellant never asked Juror #1 any specific questions about her background, beliefs, or biases.  She was only subject to the general questions directed toward the entire venire panel of prospective jurors.  Furthermore, according to the trial court, Juror #1 did not exhibit any non-verbal body language or other physical signals that could potentially have displayed bias or a visceral reaction to one of the questions.

Upon our deferential review of the trial court's findings, we are also unpersuaded by appellant's argument and see no reason to disturb the trial court's ruling.  On brief, appellant asserts that his strike of Juror #1 was valid because "it is appropriate to remove a juror whom counsel deems to have displayed disinterest in the case or about whom there is uncertainty as to her level of engagement" during *voir dire*.  However, contrary to that statement, a reasonable reading of the record suggests that Juror #1 was alert and attentive during *voir dire* and had listened carefully to the questions asked by counsel.

"Batson places upon *the trial courts* the burden of weighing the explanations tendered by [attorneys] justifying their use of peremptory strikes, assessing their genuineness, and determining whether they bespeak discriminatory motives."  Winfield v. Commonwealth, 12 Va. App. 446, 453 (1991) (emphasis added).  Appellate courts must thus give "[d]eference to trial court findings on the issue of discriminatory intent . . . because, as [was] noted in Batson,

- 19 -

the finding 'largely will turn on evaluation of credibility.'" Hernandez v. New York, 500 U.S. 352, 365 (1991) (quoting Batson, 476 U.S. at 98). Here, the trial court was in the sole position to observe Juror #1 during *voir dire*, as well as defense counsel as he tendered his arguments. Defense counsel's purported race-neutral explanation that he "couldn't get a read on [Juror #1]" was unconvincing to the trial court. This Court cannot and should not substitute its judgment for that of the trial court when the issue rests so heavily upon direct observation and a determination of credibility.

Additionally, we cannot conclude that the trial court applied the wrong legal standard when considering the Commonwealth's McCollum challenge, despite the trial court's reference to striking Juror #1 "for cause." See Yarborough v. Commonwealth, 217 Va. 971, 978 (1977) (stating that "the judgment of a trial court comes to us on appeal with a presumption that the law was correctly applied to the facts"). The record in this matter definitively supports the conclusion that the trial court was considering appellant's peremptory strikes in light of Batson and McCollum. The trial court had itself inquired whether "the Commonwealth [had] a Batson challenge," and made various comments during the arguments indicating its awareness of the proceedings occurring before it. Thus, the balance of the record demonstrates that the trial court was fully cognizant of what it was considering. "[This Court] will not fix upon isolated statements of the trial judge taken out of the full context in which they were made, and use them as a predicate for holding the law has been misapplied." Id. The mere fact that the trial court misspoke when it ruled does not rebut the presumption of regularity.

Accordingly, the Court cannot find that the trial court's ruling on the McCollum challenge was clearly erroneous, nor do we find that the trial court applied an incorrect legal standard.

Affirmed.