COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, O'Brien and Athey
Argued at Fredericksburg, Virginia


IAN ALEXANDER ZIMMERMAN

MEMORANDUM OPINION[*] BY
v.      Record No. 0507-22-4      JUDGE MARY GRACE O'BRIEN
AUGUST 15, 2023

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF PAGE COUNTY
Clark A. Ritchie, Judge

Caleb J. Routhier (Miller, Earle & Shanks, PLLC, on briefs), for appellant.

Timothy J. Huffstutter, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Tried by a jury, Ian Alexander Zimmerman (appellant) appeals his convictions for

second-degree murder in violation of Code § 18.2-33 and felony child abuse in violation of Code

§ 18.2-371.1. In twelve assignments of error,[1] appellant challenges the trial court's rulings

concerning jury selection, admission of evidence, closing argument, and denial of his motion to

strike the evidence.

BACKGROUND

On appeal, "we review the evidence in the 'light most favorable' to the Commonwealth."

*Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc) (quoting *Commonwealth v.*

*Hudson*, 265 Va. 505, 514 (2003)). That principle requires us to "discard the evidence of the

accused in conflict with that of the Commonwealth, and regard as true all the credible evidence

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Appellant originally designated fourteen assignments of error but conceded both the
twelfth and fourteenth on brief.

favorable to the Commonwealth and all fair inferences that may be drawn therefrom." *Kelly v. Commonwealth*, 41 Va. App. 250, 254 (2003) (en banc) (quoting *Watkins v. Commonwealth*, 26 Va. App. 335, 348 (1998)).

## I. Evidence at Trial

In November 2019, appellant and his girlfriend, Melody Butler, lived together with three children from their previous relationships: appellant's one-and-a-half-year-old son, and Butler's two-year-old and ten-month-old sons.

Butler typically cared for the children while appellant was at work. On November 20, 2019, however, appellant watched the children while Butler went to a morning job interview. When she left, her ten-month-old son, Averest, was awake and "sitting up playing with his toys, giggling[, and] happy."

On her way home, appellant called and told her that "there's something wrong with Averest." Appellant explained that Averest "fell off the couch" and "wasn't responding to him." According to Butler, appellant sounded calm. She told him to call 911 "if it's that bad"; otherwise, she would "be home in a couple of minutes."

Testifying in his own defense, appellant stated that Averest needed a diaper change after breakfast, so he put the child on the couch in the living room while he went to the children's bedroom to retrieve wipes. Appellant estimated he was gone "[a]nywhere from ten to twenty seconds" when he heard a "thump or a thud" followed by "whimpering." Appellant testified that when he returned to the living room, he found Averest "on the floor face down next to the couch."

Appellant said he immediately picked Averest up and noticed a "big bruise" on his forehead. He saw bruises under the child's chin and remembered Butler pointing them out several days earlier. According to appellant, Averest was shaking and sticking his tongue in and out of his mouth. Appellant stated that he gave Averest a bottle, which Averest "drank from . . . a little bit."

- 2 -

Appellant testified that he set the bottle on Averest's chest "so he knew what it was" and he "felt like [Averest] was trying to grab at it."

Averest's eyes were "glassy," and appellant believed the child was having a seizure or had a concussion. Averest became nonresponsive after about ten minutes and "went pale." Appellant testified that he shook the child "gently . . . [m]aybe three to four times . . . just enough to try and rouse a response out of [him]." Because Averest "couldn't hold himself up," appellant tried to support the child's neck and head while shaking him.

Appellant laid Averest on the couch and went to a neighbor's apartment to borrow a phone. The neighbor testified that appellant told her Averest had fallen or rolled off the couch, hit his head, and was "acting weird." Appellant did not appear panicked but was upset. The neighbor offered to help, but appellant "just took the phone," and returned it ten to fifteen minutes later.

When Butler arrived home shortly after appellant's call, she saw Averest lying on the couch and she "could clearly tell that there was something severely wrong" with him. She described the child as "very limp," with "no function of his body at all," and stated that "[h]is eyes were like he wasn't even there," and "his skin was very cold." At that point, appellant became "very, very panicked." Butler rushed Averest to the hospital. While she was there, appellant called her and explained that the child had fallen off the couch and "just became unresponsive." According to Butler, appellant "did not ask . . . if [Averest] was going to be okay," but said "they're going to arrest me" because "I'm the only one here."

Nurse Amanda Painter testified that Butler brought Averest to the emergency room at 12:02 p.m. and "[i]t was immediately obvious" that something was wrong. Painter stated that Averest was unresponsive, "all four of his extremities . . . were limp," "[h]is head was rolled to one side," "[h]e was very pale," and "he was taking very shallow, gasping breaths." Averest also had a

low heart rate and bruising on his forehead and chest. Painter saw "scattered bruising in various stages of healing" under Averest's chin and on his left hip, right shoulder, chest, and forehead.

Dr. Ankur Fadia, an ER doctor who evaluated Averest, testified that the child was obviously "suffering from some grave[,] life[-]threatening problem" upon arrival and showed signs of "significant brain damage." Dr. Fadia testified that Averest's left pupil was "blown," or unresponsive, indicative of a "devastating" brain injury, and his right pupil "blew" while at the hospital. Dr. Fadia also observed bruising in various locations on the child's body.

Nurse Gina Yates testified that Averest was "posturing," an action that reflects neurological damage. Yates explained that posturing individuals move their limbs either "toward their core or away from their core" and can perform "no other movement other than that." Dr. Fadia testified that Averest's posturing indicated "severe brain damage."

Averest was intubated to secure his breathing and transported by helicopter to the University of Virginia Medical Center at 1:17 p.m. Dr. Fadia testified that before Averest was intubated, medical personnel first had to clear vomit from his lungs. Vomit is associated "with severe head injuries especially when there is bleeding in the brain." Based on the nature of Averest's injuries, Yates called the police.

Sergeant William Fadley spoke to appellant at the apartment. Appellant explained that Averest fell from the couch on to the floor, a distance that Sergeant Fadley measured as 17 inches. Sergeant Fadley testified that appellant showed "no emotion whatsoever" while talking with him and did not ask about Averest's condition. Sergeant Fadley also saw wipes in a drawer in the living room.

Dr. Noreen Crain, a UVA pediatrician who qualified as an expert in pediatric critical care, evaluated Averest when he arrived at the Medical Center. Averest was posturing and unable to withdraw from painful stimulation, which Dr. Cain described as a "concerning collection of

findings regarding the child's extent of a brain injury." A CT scan showed a subdural hematoma, "an area of bleeding . . . below the skull but above the brain." Dr. Cain testified that a subdural hematoma in a child is an injury typically associated "with some amount of force," such as "blunt force trauma" or "shaken impact syndrome."

Dr. Jeanne Parrish, from the UVA forensics team, also assessed Averest, documenting his injuries and taking photographs that were introduced at trial. She noted bruising on the child's back as well as a "linear pattern" of bruising on his legs, indicative of "something that caused" the pattern like "a potential robust handprint." Dr. Parrish also noted bruising on the child's torso, ears, and neck.

Although Dr. Parrish testified as a fact witness, appellant attempted to cross-examine her with medical literature about shaken baby syndrome and abusive head trauma. The Commonwealth argued that Dr. Parrish only testified as a fact witness and she was not prepared to address the medical literature. Appellant then asked the court to qualify Dr. Parrish as an expert in pediatrics. The Commonwealth objected, arguing that appellant "can't make her an expert and then impeach her." The court sustained the objection.

On November 22, Dr. Clyde J. Smith, who helped treat Averest upon his arrival at UVA, conducted a "brain death" exam to look for neurologic function. The exam revealed that Averest's pupils did not react to light, and he had no corneal reflexes, no brain activity, and no breathing reflex. Dr. Smith pronounced Averest dead at 5:31 p.m.

Dr. Carmen Coles performed an autopsy. The autopsy report documented bruising throughout Averest's body. His lungs showed signs of pneumonia, his brain was swollen, and he had subdural bleeding.

At Dr. Coles's request, Dr. Jocelyn Posthumus, an expert in pathology and neuropathology, examined cells from Averest's brain tissue. Dr. Posthumus noted a subarachnoid hemorrhage,

clotting in the brain's blood vessels, brain swelling, and retinal hemorrhages. She described "diffuse[] traumatic axonal injury"—torn nerve fibers—in the brain and neck. Further, Dr. Posthumus diagnosed severe hypoxic ischemic injury (tissue death resulting from lack of oxygen and associated with "being on a ventilator for an extended period of time"), "acute pituitary infarction" (loss of blood supply to the pituitary gland), and severe hemorrhagic retinopathy with retinal detachment.

Relying on Dr. Posthumus's findings, Dr. Coles concluded that Averest died from shaken impact syndrome.

Appellant presented the opinions of two medical experts concerning Averest's cause of death. Dr. Joseph Scheller stated that Averest died of a stroke. Dr. Roland Auer stated that Averest died of interstitial pneumonia.

## II. Pretrial Motions

Prior to trial, appellant moved to exclude any opinion, either lay or expert, of "homicide and abuse," as invading the province of the jury by addressing the ultimate issue of fact. Appellant noted that the autopsy report referred to "homicide," along with shaken impact syndrome, as the cause of Averest's death, and several of the Commonwealth's expert witnesses referred to "abusive head trauma" in their reports. The Commonwealth agreed to redact the word "homicide" from the autopsy report, but the court denied appellant's motion to exclude witness opinions about abuse.

At the pretrial hearing, the court granted the Commonwealth's motion *in limine* to preclude appellant from eliciting specific instances of conduct from his character witnesses to show that he was not a violent person, including "[a]ny reference to [appellant's] specific interaction with children or actions not on the date of the offense."

The court also considered the parties' proposed voir dire questions. Appellant objected to three questions proposed by the Commonwealth. He argued that the first proposed question—"Do

you understand that reasonable doubt does not require proof beyond all possible doubt[,] nor is the Commonwealth required to disprove every conceivable circumstance of innocence?"—was argumentative and incorrectly instructed the jury that the Commonwealth could "prove the case with some doubt in [the jury's] minds." The court overruled his objection.

Appellant next argued that the second proposed question—"[I]f you hear two expert witnesses testify in [c]ourt and they give contradictory opinions[,] [i]s there anyone that would automatically not feel comfortable deciding to believe one over the other regardless of the evidence?"—improperly gave jurors the impression that they had "to make a decision[,] when the jury doesn't have to make a decision between two experts." The court overruled the objection.

Finally, appellant argued that the third proposed question—"Are any of you uncomfortable about accepting the responsibility to determine who is telling the truth?"—failed to capture instances where "both people are telling . . . slightly different stories but they're both telling the truth." The court overruled the objection.

### III. Jury Selection

During voir dire, Juror 51, a former police officer, advised that the assistant Commonwealth's attorney had prosecuted cases in which he had been involved, and he also had "called [the prosecutor] like two years ago on a civil case." The juror asserted that his previous interaction with the prosecutor would not affect his "ability to impartially decide [the] case based solely on the law and the evidence." Juror 51 also stated that he currently works at a medical facility, which would not affect his ability to be impartial. The court denied appellant's motion to strike Juror 51 for cause.

After jury selection, appellant raised a *Batson*[2] challenge to the Commonwealth's peremptory strikes eliminating all four prospective jurors under the age of 40 and striking Juror 60,

---

[2] *Batson v. Kentucky*, 476 U.S. 79 (1986).

the only Hispanic individual in the venire.  The Commonwealth responded that age is not a "valid challenge" under *Batson* but explained its reasons for striking the four jurors.  The Commonwealth also explained that Juror 60 made "vulgar statements on social media" and had a "large [collection] of traffic tickets," which could influence his attitude toward law enforcement.  Appellant responded that he "wasn't aware of those things.  I just saw that he didn't answer any questions and he's the only [H]ispanic here and he's young."  The court overruled the challenges, finding that the Commonwealth had offered "appropriate reason[s]" for the strikes.

ANALYSIS

I.  Appellant has waived Assignments of Error 1, 4, 9, 10, and 11 due to his failure to properly file a transcript of the last day of trial.

The record is missing the transcript from the last day of the trial, September 17, 2021, which includes the court's denial of appellant's motion to strike and motion for judgment notwithstanding the verdict.  The transcript also contained the court's rulings related to appellant's objections to the Commonwealth's rebuttal closing argument.  Although appellant filed a copy of the September 17 transcript with this Court on July 26, 2022, it was not certified as a true and accurate record by the court reporter, and there is nothing on that document, such as a file-stamp, indicating that he previously filed it with the clerk of the circuit court.

"The content of the record on appeal is delineated by Rule 5A:7."  *Browning v. Browning*, 68 Va. App. 19, 27 (2017).  Rule 5A:7(a)(7) provides that the record on appeal includes "the transcript of any proceeding . . . when made part of the record as provided in Rule 5A:8."  Rule 5A:8 requires that for a transcript to become part of the record, it must be "filed in the office of the clerk of the trial court within 60 days after entry of the final judgment."

Appellant claims that the missing transcript was filed with the circuit court clerk's office "back in the spring" and maintains that the clerk's office "just accidentally did not include it when [it] sent the record."

However, appellant never asked the circuit court to correct any purported clerical mistake by making the missing transcript part of the record. *See Belew v. Commonwealth*, 284 Va. 173, 178-81 (2012) (recognizing a circuit circuit's authority under Code § 8.01-428(B) and Rule 5A:9 to make missing transcripts part of the record "before the appeal is docketed in the appellate court" (quoting Code § 8.01-428(B))). Additionally, appellant never asked this Court to issue a writ of certiorari compelling the circuit court to enlarge the record by forwarding to us any missing transcript. *See Watkins*, 26 Va. App. at 341 ("After the record has been transmitted to this Court[,] . . . the record on appeal cannot be enlarged except by our award of a writ of certiorari under Code § 8.01-673." (quoting *Godfrey v. Commonwealth*, 227 Va. 460, 465 (1984))). Instead, appellant submits that the "error on the part of the Page County Circuit Clerk's Office can be verified with a phone call, or if the Court prefers, an affidavit."

Although appellant followed none of the proper channels to have the missing transcript made part of the record, he nevertheless argues that the Commonwealth suffered no prejudice. However, "[n]oticeably absent from Rule 5A:8(b)(4)(ii) is any mention of prejudice." *Browning*, 68 Va. App. at 27. Accordingly, Rule 5A:8(b)(4)(ii) requires this Court to conclude that the September 17, 2021 transcript is not part of the record on appeal.

"[T]he failure to present a complete record upon which this Court can make an effective determination of the issues may bar . . . consideration of a party's assigned errors." *Browning*, 68 Va. App. at 25. "[A]ny assignments of error for which the arguments below are 'contained within the untimely-filed transcript' and for which the subject transcript is 'indispensable to the determination of th[e] issue[s]' . . . are 'waived on appeal.'" *Id.* at 30 (second and third alterations in original) (quoting *Shiembob v. Shiembob*, 55 Va. App. 234, 246 (2009)).

Appellant's assignments of error 1, 4, 9, 10, and 11 challenge the court's denial of appellant's motions to strike and for judgment notwithstanding the verdict, the closing arguments,

- 9 -

and the Commonwealth's rebuttal argument. The missing transcript includes the court's rulings on those issues as well as appellant's arguments and objections. Because we cannot evaluate the court's reasoning and appellant's objections preserving the issues he raises on appeal, we find that the September 17 transcript is indispensable to this Court's consideration of those issues, and thus, assignments of error 1, 4, 9, 10, and 11 are waived.

## II. Appellant's Challenges to Jury Selection (Assignments of Error 2, 6, and 7)

### A. Rule 5A:18 precludes us from considering appellant's challenge to the denial of his motion to strike Juror 51 (Assignment of Error 2).

Appellant argues the court erred by denying his motion to strike Juror 51 because the former police officer had worked on cases with the prosecutor, making him the prosecutor's "client." He contends that denying his motion to strike "creat[ed] a lack of confidence by the public in the integrity of the process."

Rule 5A:18 precludes appellate consideration of this argument. Appellant never argued to the trial court that empaneling Juror 51 would weaken public confidence in the proceedings. He merely argued that Juror 51 had "connections . . . from the police side of things" because one of the prosecutors "prosecuted his cases." "Public confidence in the integrity of the judicial system, as a ground for excluding a juror for cause, must be raised in the trial court or that issue is waived." *Townsend v. Commonwealth*, 270 Va. 325, 333 (2005); *see also Vay v. Commonwealth*, 67 Va. App. 236, 261 n.11 (2017).

Appellant asks us to apply the "ends of justice" exception to Rule 5A:18. "The ends of justice exception is narrow and is to be used sparingly[.]" *Holt v. Commonwealth*, 66 Va. App. 199, 209 (2016) (en banc) (quoting *Redman v. Commonwealth*, 25 Va. App. 215, 220 (1997)). "In deciding whether the exception should apply, an appellate court must ask two questions: '(1) whether there is error as contended by the appellant; and (2) whether the failure to apply the

ends of justice provision would result in a grave injustice.'" *Fletcher v. Commonwealth*, 72

Va. App. 493, 510 (2020) (quoting *Gheorghiu v. Commonwealth*, 280 Va. 678, 689 (2010)).

Appellant has not established an error. When reviewing the denial of a motion to strike a

juror for cause, "appellate courts 'must give deference to the circuit court's determination whether

to exclude a prospective juror because that court was able to see and hear each member of the venire

respond to questions posed.'" *Keepers v. Commonwealth*, 72 Va. App. 17, 42 (2020) (quoting

*Green v. Commonwealth*, 262 Va. 105, 115 (2001)); *see also Huguely v. Commonwealth*, 63

Va. App. 92, 121 (2014) ("Juror impartiality is a question of fact, and a trial court's decision to seat

a juror is entitled to great deference on appeal." (citations omitted) (quoting *Lovos-Rivas v.*

*Commonwealth*, 58 Va. App. 55, 61 (2011))).

Here, the court heard the entire voir dire and, in its discretion, determined that Juror 51

could be fair and impartial. That determination is entitled to great deference on appeal. *See*

*Huguely*, 63 Va. App. at 121. Additionally, a police officer is not a "client" of the Commonwealth

Attorney's office; there is no attorney-client relationship between the officer and a prosecutor in a

criminal case. The prosecutor represents the Commonwealth, not the officer.

Thus, we find that the Rule 5A:18 precludes consideration of this argument.

### B. The court did not err by denying appellant's *Batson* challenges (Assignment of Error 6 and 7).

Appellant argues that the Commonwealth's peremptory strikes of "all four jurors who were

even remotely close to his age," "depriv[ed] [him] of a jury of his peers." He also challenges the

Commonwealth's peremptory strike of Juror 60 because he was "the only [H]ispanic" juror and was

struck "on racial grounds."

"[A] defendant [has] the right to be tried by a jury whose members are selected pursuant to

nondiscriminatory criteria." *Batson v. Kentucky*, 476 U.S. 79, 85-86 (1986). In *Batson*, the United

States Supreme Court held that the Equal Protection Clause forbids peremptory exclusion of

potential jurors based solely on race. *Id.* at 89; *see also Stevens v. Commonwealth*, 70 Va. App. 280, 296-99 (2019). The Supreme Court has extended *Batson* to preclude peremptory strikes based on gender discrimination. *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 144-45 (1994).

Appellant first asks us to extend *Batson* to age-discrimination claims. However, this Court has long-allowed age-based peremptory strikes. *See, e.g.*, *Chambliss v. Commonwealth*, 9 Va. App. 267, 269-70 (1989) (accepting Commonwealth's age-based reasons for striking the two youngest jurors on the venire); *Riley v. Commonwealth*, 21 Va. App. 330, 335 (1995) (finding that trial court "correctly concluded that age is a permissible basis upon which to exercise a peremptory strike"). Thus, based on the interpanel-accord doctrine, we reject appellant's argument. *See Bush v. Commonwealth*, 68 Va. App. 797, 808 n.4 (2018) ("A decision of one panel protected by the interpanel[-]accord doctrine 'cannot be overruled except by the Court of Appeals sitting *en banc* or by the Virginia Supreme Court.'" (quoting *White v. Commonwealth*, 67 Va. App. 599, 612 n.7 (2017))).

Appellant also contends that the Commonwealth's race-neutral explanation for striking Juror 60 was insufficient. Appellant argues that the "vulgar social media" posts the Commonwealth relied on were from 2011, when the juror was only 14 years old. Additionally, appellant also attached "subsequent research" to his appellate brief concerning the criminal histories of several jurors who were empaneled.

The information appellant presents on appeal, however, was not submitted to the trial court to consider, and we likewise do not consider it on appeal. *See Jackson v. Commonwealth*, 44 Va. App. 218, 224 (2004) ("An appellate court must dispose of [a] case upon the record and cannot base its decision upon appellant's petition or brief or statements of counsel in open court. We may act only upon facts contained in the record." (quoting *Smith v. Commonwealth*, 16 Va. App. 630,

635 (1993))); *see also Wilkins v. Commonwealth*, 64 Va. App. 711, 717 (2015), *aff'd*, 292 Va. 2 (2016); Rule 5A:18 (limiting appellate review to "ruling[s] of the trial court").

We hold that the court did not err by accepting the Commonwealth's race-neutral explanation for the peremptory strike of Juror 60. "*Batson* places upon *the trial courts* the burden of weighing the explanations tendered by [attorneys] justifying their use of peremptory strikes, assessing their genuineness, and determining whether they bespeak discriminatory motives." *Stevens*, 70 Va. App. at 305 (alteration in original) (quoting *Winfield v. Commonwealth*, 12 Va. App. 446, 453 (1991)). Appellate courts must thus "[defer] to trial court findings on the issue of discriminatory intent . . . because, as [was] noted in *Batson*, the finding 'largely will turn on evaluation of credibility.'" *Id.* (second and third alterations in original) (quoting *Hernandez v. New York*, 500 U.S. 352, 365 (1991)).

The court considered the prosecutor's explanation of his peremptory strike. The race-neutral explanation, based on the juror's social medial presence and traffic tickets, was convincing to the trial court. "This Court cannot and should not substitute its judgment for that of the trial court when the issue rests so heavily upon direct observation and a determination of credibility." *Id.* at 306.

III. The court did not err by overruling appellant's objections to the Commonwealth's voir dire questions (Assignment of Error 8).

Appellant contends three voir dire questions exceeded the scope of Code § 19.2-262.01, which addresses the voir dire of prospective jurors in criminal cases.

Code § 19.2-262.01 provides:

> In any criminal case, the court and counsel for either party shall have . . . the right to ask [a potential] juror directly *any relevant question to ascertain whether the juror can sit impartially* in either the guilt or sentencing phase of the case. Such questions *may include* whether the person or juror is related to either party, has any interest in the cause, has expressed or formed any opinion, or is sensible of any bias or prejudice therein.

- 13 -

(Emphases added). The statutory language thus broadly allows "any" relevant question to determine a prospective juror's impartiality and uses the phrase "may include" to introduce a non-exhaustive list of such relevant questions.

"It is well-established that the manner of conducting voir dire, including the exclusion of questions to the venire, is committed to the trial court's discretion[,] and we review its rulings only for abuse of that discretion." *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013). "[W]hen a decision is discretionary[,] . . . 'the court has a range of choice, and . . . its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law.'" *Id.* at 212-13 (third and fourth alterations in original) (quoting *Landrum v. Chippenham & Johnson-Willis Hosps., Inc.*, 282 Va. 346, 352 (2011)).

Appellant contends the questions here were not relevant to determining bias. He argues that the first question served only to "plant the seed" in jurors' minds that proof beyond a "reasonable doubt is not all that high of a bar to reach," the second question compelled them to pick between conflicting expert opinions when "I don't know" is a viable option, and the third prepared them to discredit appellant's testimony.

However, the questions tracked common legal principles. The first challenged question, addressing reasonable doubt ("Do you understand that reasonable doubt does not require proof beyond all possible doubt, nor is the Commonwealth required to disprove every conceivable circumstance of innocence?") mirrors language in Model Jury Instruction 2.100.[3] This question was relevant because it would "disclose or clearly lead to the disclosure" of a juror's opinion or bias against the reasonable-doubt standard. *Buchanan v. Commonwealth*, 238 Va. 389, 401 (1989).

---

[3] In relevant part, Model Jury Instruction 2.100 provides that proof beyond a reasonable doubt "does not require proof beyond all possible doubt, nor is the Commonwealth required to disprove every conceivable circumstance of innocence."

Likewise, the expert-witness question ("If you hear two expert witnesses testify in [c]ourt and they give contradictory opinions[,] is there anyone who would automatically not feel comfortable deciding to believe one over the other, regardless of the evidence?") did not, as appellant contends, foreclose a juror's option to decide not to believe either expert. Instead, it sought to reveal whether any juror would automatically view evidentiary conflicts as inconsistent with guilt.

The third challenged question ("Are any of you uncomfortable about accepting the responsibility to determine who is telling the truth?") assessed the jurors' willingness to determine witness credibility. The question was designed to reveal whether prospective jurors had any resistance to their factfinding role.

We therefore hold that the questions were proper under Code § 19.2-262.01, and the court did not abuse its discretion in allowing the three challenged questions.

IV. The court did not err by allowing the Commonwealth's witnesses to testify that Averest suffered abusive head trauma (Assignment of Error 3).

Appellant contends the court erred by allowing the Commonwealth's witnesses to testify that Averest suffered abusive head trauma, arguing that this testimony established the "ultimate issue" in the case and therefore invaded the province of the jury. Several witnesses testified that the injuries were "consistent with abusive head trauma" and were not consistent with a 17-inch fall, pneumonia, or a stroke, as appellant's experts opined.

We review evidentiary decisions, including whether to allow lay or expert opinion testimony, for an abuse of discretion. *See Price v. Commonwealth*, 18 Va. App. 760, 765 (1994).

"In criminal proceedings, opinion testimony on the ultimate issues of fact is not admissible." Va. R. Evid. 2:704(b). "[U]ltimate issue[s] of fact" in a criminal prosecution include "[t]he elements of an offense and the identity of the criminal agent." *Jenkins v. Commonwealth*, 21 Va. App. 222, 226 (1995), *rev'd en banc*, 22 Va. App. 508 (1996), *rev'd*, 254 Va. 333 (1997).

- 15 -

"[T]he mere fact that an expert's testimony tends to prove an ultimate fact in issue does not preclude the witness from testifying on a subject." *Zook v. Commonwealth*, 31 Va. App. 560, 566 (2000). Instead, a witness's opinion is impermissible if it leaves the jury no option but to render a guilty verdict. *See Bond v. Commonwealth*, 226 Va. 534, 539 (1984) (holding that expert testimony in a murder case that the victim's death resulted from homicide impermissibly invaded the province of the jury).

In *Price*, 18 Va. App. at 766, we affirmed the defendant's conviction for the second-degree murder of an infant, finding no error in the court's admission of a medical expert's testimony that the child's physical injuries "collectively point to a very medically probable child abuse, such as the battered child syndrome." *Id.* at 763. The expert did not opine as to the identity of the abuser. *Id.* In concluding that an expert had not opined as to an ultimate issue of fact, we stated that "[t]he expert's testimony on the syndrome is not an opinion regarding the culpability of any particular defendant . . . . [It] merely tends to show that the child was intentionally, rather than accidentally, injured." *Id.* at 765 (alterations in original) (quoting *Commonwealth v. Rodgers*, 528 A.2d 610, 614 (Pa. 1987), *appeal denied*, 542 A.2d 1368 (Pa. 1988)).

Likewise, here, the lay and expert testimony that Averest's injuries were consistent with abusive head trauma did not invade the province of the jury. The witnesses did not identify appellant as the criminal agent, and their testimony "merely tend[ed] to show that the child was intentionally, rather than accidentally, injured." *Id.* (quoting *Rodgers*, 528 A.2d at 614).

Furthermore, the Commonwealth's opinion evidence contradicted appellant's defense that Averest died from pneumonia or a stroke, not from abusive head trauma. In other words, the purpose of the opinion evidence was to prove an element of the offense and eliminate other theories about Averest's cause of death. The mere fact that a witness's opinion provides proof of an ultimate issue of fact does not preclude the evidence, *Zook*, 31 Va. App. at 566, especially in the case of

- 16 -

expert opinions that assist a jury in resolving factual issues that "cannot be determined intelligently merely from the deductions made and inferences drawn on the basis of ordinary knowledge, common sense, and practical experience," *Schooler v. Commonwealth*, 14 Va. App. 418, 420 (1992) (quoting *Compton v. Commonwealth*, 219 Va. 716, 726 (1979)). For example, Dr. Posthumus, along with several doctors who testified as lay witnesses, testified as an expert in neuropathology and presented the jury with evidence showing that cellular damage to Averest's brain was consistent with shaken impact syndrome. This expert testimony never identified appellant as the criminal agent; instead, it was evidence that Averest was intentionally injured, making appellant's defense that pneumonia or stroke caused the child's death less probable.

### V. The court did not err by precluding evidence of specific acts as character evidence (Assignment of Error 5).

Appellant argues the court "erred when it forbade [him] from introducing character evidence of specific instances of conduct to contradict the Commonwealth's claim that [he] acted violently." Specifically, he contends that Virginia Rule of Evidence 2:405(b) permits him to introduce specific instances of conduct to establish his character for non-violence.

"Whether evidence is admissible falls within the broad discretion of the trial court, and this Court will not disturb the trial court's ruling absent a clear abuse of discretion." *Argenbright v. Commonwealth*, 57 Va. App. 94, 98 (2010).

At trial, a defendant may "introduce evidence of his reputation for pertinent character traits on the theory that it is improbable that a person who has a good reputation for such traits would be likely to commit the crime charged against him." *Id.* (quoting *Weimer v. Commonwealth*, 5 Va. App. 47, 52 (1987)). However, a defendant "in order to establish good character, is not permitted to prove specific acts, custom, or course of conduct." *Id.* at 100 (quoting *Chiles v. Commonwealth*, 12 Va. App. 698, 700 (1991)). The defendant "is confined to proof of the opinion

that the people of the community have about him." *Id.* (quoting *Zirkle v. Commonwealth*, 189 Va. 862, 871 (1949)).

Rule 2:405(b) provides an exception to this general rule, but it allows evidence of "specific instances of conduct" only when the defendant's character trait is an "essential element of a charge, claim, or defense." *See* Va. R. Evid. 2:405(b) ("In cases in which a character trait of a person is an essential element of a charge, claim, or defense, proof may . . . be made of specific instances of conduct of such person on direct or cross-examination."); *cf. Carter v. Commonwealth*, 293 Va. 537, 546 (2017) (recognizing the admissibility of specific instances of a victim's character for violence when a defendant claims self-defense).

Here, appellant's character was not an "essential element" of a charge, claim, or defense. Further, appellant was allowed to present evidence that he had a reputation not only for truthfulness and peacefulness, but also for practicing good childcare—a character trait directly related to the charges against him.

Because having a violent character is not an "essential element" of the charges against him, the court did not abuse its discretion in precluding evidence of "specific instances of conduct" under Rule 2:405(b).

### VI. The court did not err by denying appellant's motion to qualify Dr. Parrish as an expert on cross-examination (Assignment of Error 13).

Appellant contends the court erred by precluding him from qualifying Dr. Parrish as an expert on cross-examination but allowing the Commonwealth to ask her questions that called for an expert opinion. Dr. Parrish testified as a fact witness for the prosecution regarding her examination and assessment of Averest's injuries and the photographs she took.

"Whether to qualify a witness as an expert rests largely within a trial court's discretion." *Wakeman v. Commonwealth*, 69 Va. App. 528, 535 (2018) (quoting *Spencer v. Commonwealth*, 238 Va. 563, 573 (1989)), *aff'd per curiam*, 298 Va. 412 (2020).

The Commonwealth elicited testimony from Dr. Parrish that Averest's injuries were "highly suspicious for non-accidental trauma," not consistent with falling from a couch, not consistent with a child his age, and "highly concerning for child abuse." Dr. Parrish also explained that her team's "NAT protocols" referred to "non-accidental trauma" protocols "that need to be completed when there's a suspicion of non-accidental trauma." This testimony, however, was within Dr. Parrish's realm of direct and personal knowledge as a member of the UVA forensics team that documented Averest's injuries. Further, appellant never objected to these questions.

We do not find that the court abused its discretion by denying appellant's request to designate Dr. Parrish as an expert witness for cross-examination purposes.

CONCLUSION

This Court cannot consider several assignments of error because the transcript of the last day of trial, essential for our determination, was not part of the record on appeal, and Rule 5A:18 precludes us from considering appellant's challenge to the denial of his motion to strike Juror 51. We hold that the court did not err by denying appellant's *Batson* challenges or by overruling appellant's objections to the Commonwealth's voir dire questions.

As for the evidentiary issues on appeal, the court did not err by allowing witnesses to testify to conclusions about Averest's injuries, by excluding "specific instances" of appellant's nonviolent character, or by not designating the Commonwealth's lay witness as an expert on child abuse during cross-examination.

Accordingly, we affirm the convictions and remand solely for correction of the sentencing order.[4]

*Affirmed and remanded.*

---

[4] The sentencing order mistakenly orders a $50,000 fine as part of appellant's sentence for murder, which is not an authorized punishment under Code § 18.2-33. We note, however, that the jury recommended a $50,000 fine as part of his sentence for child abuse, not murder. Thus, we remand for correction of the sentencing order.