Present:  All the Justices

KENT JERMAINE JACKSON

v.  Record Nos. 030749 & 030750          OPINION BY
                                    JUSTICE ELIZABETH B. LACY
                                         October 31, 2003
COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Verbena M. Askew, Judge

In this appeal, we review the capital murder conviction and death penalty imposed on Kent Jermaine Jackson, along with his convictions of robbery, felony stabbing, and statutory burglary.

FACTS

In accord with established principles of appellate review, we recite the facts in the light most favorable to the Commonwealth, the party prevailing below.  Commonwealth v. Bower, 264 Va. 41, 43, 563 S.E.2d 736, 737 (2002).

On April 18, 2000, the body of Beulah Mae Kaiser, 79 years of age, was found in her apartment.  According to the medical examiner, Mrs. Kaiser died from a combination of a stab wound to her jugular vein, a fractured skull, and asphyxia caused by blockage of her airway by her tongue.  Any one of these injuries could have been fatal.  In addition to these injuries, Mrs. Kaiser suffered two black eyes, a broken nose, and multiple abrasions, lacerations, and bruises.  She had five stab wounds to her head and neck, including the wound

to her jugular vein. The medical examiner also testified that Mrs. Kaiser had been anally sodomized with her walking cane and that the cane then had been driven into her mouth with such violence that it knocked out most of her teeth, tore her tongue and forced it into her airway, fractured her jaw, and penetrated the left side of her face.

When Mrs. Kaiser's body was found, her apartment was in disarray. Personal items were strewn throughout the apartment, blood spatters were on the surfaces of the apartment, and the contents of Mrs. Kaiser's purse had been dumped on the floor. The police were unable, however, to find a weapon or any fingerprints of value.

The crime went unsolved for over 16 months until DNA testing of saliva on a cigarette butt found in the apartment implicated an individual named Cary Gaskins. An interview with Gaskins led the police to Joseph M. Dorsett and Jackson, who had been roommates in an apartment across the hall from Mrs. Kaiser's apartment at the time of her death. Following an interview with Dorsett, Newport News police arrested Dorsett, charging him with Mrs. Kaiser's murder, and obtained a warrant for Jackson's arrest.

Police arrested Jackson at a girlfriend's home in King George County around 4:00 a.m. on August 29, 2001. During an interview with Newport News police detectives at the King

2

George County jail that afternoon, Jackson confessed to the murder of Mrs. Kaiser.

### PROCEEDINGS

On January 14, 2002, Jackson was indicted by a Newport News grand jury for the capital murder of Beulah Mae Kaiser in the commission of a robbery or attempted robbery, robbery, felony stabbing, statutory burglary, and object sexual penetration, in violation of Code §§ 18.2-31, 18.2-58, 18.2-53, 18.2-90, and 18.2-67.2, respectively.

Prior to trial, Jackson filed motions seeking a change of venue, suppression of his confession, a bill of particulars, and additional peremptory strikes. The trial court denied these motions and rejected Jackson's arguments that Virginia's capital murder statutes are unconstitutional. Following a six-day trial, a jury convicted Jackson of all charges except object sexual penetration. In a subsequent sentencing proceeding, the jury found the aggravating factor of vileness and fixed a sentence of death for the capital murder conviction and fixed sentences totaling life imprisonment plus 25 years and a $100,000 fine for the remaining convictions. During a post-verdict hearing, the trial court considered the pre-sentence report, further evidence presented by Jackson, and the arguments of counsel. In its final judgment, the trial court imposed the sentences fixed by the jury.

We have consolidated the automatic review of Jackson's death sentence with his appeal of the capital murder conviction in Record No. 030749 and have given them priority on the docket. Code §§ 17.1-313(A), (F), and (G). We have also certified Jackson's appeal of his non-capital convictions from the Court of Appeals of Virginia, Record No. 030750, and have consolidated the two records for consideration.

ISSUES PREVIOUSLY DECIDED

Jackson raises fifteen assignments of error, four of which contain arguments that this Court has rejected in previous cases. Since Jackson presents no new arguments on these questions, we adhere to our previous holdings and affirm the rulings of the trial court:

(1) denying the defendant's motion for a bill of particulars seeking a narrowing construction of the vileness aggravator and identification of the evidence on which the Commonwealth intended to rely when seeking the death penalty. See Green v. Commonwealth, 266 Va. 81, 107, 580 S.E.2d 834, 849 (2003); Goins v. Commonwealth, 251 Va. 442, 454, 470 S.E.2d 114, 123 (1996); Strickler v. Commonwealth, 241 Va. 482, 490, 404 S.E.2d 227, 233 (1991).

(2) refusing to declare Virginia's capital murder statutes unconstitutional because (a) they do not

4

adequately instruct the jury on the weight it should assign to aggravating and mitigating factors, Satcher v. Commonwealth, 244 Va. 220, 228, 421 S.E.2d 821, 826 (1992), (b) do not require aggravating factors to outweigh mitigating factors beyond a reasonable doubt, Mickens v. Commonwealth, 247 Va. 395, 403, 442 S.E.2d 678, 684 (1994), vacated and remanded on other grounds, 513 U.S. 922 (1994); (c) are unconstitutionally vague in defining "vileness" and "future dangerousness," Id.; (d) allow evidence of unadjudicated criminal conduct in the sentencing phase, Satcher, 244 Va. at 228, 421 S.E.2d at 826; (e) constitute cruel and unusual punishment, Spencer v. Commonwealth, 238 Va. 275, 280-81, 384 S.E.2d 775, 777-78 (1989), and are contrary to "evolving standards of decency" under Trop v. Dulles, 356 U.S. 86, 100 (1958), Satcher, 244 Va. at 228, 412 S.E.2d at 826; (f) do not require the court to set aside the death penalty on showing of good cause, Breard v. Commonwealth, 248 Va. 68, 76, 445 S.E.2d 670, 675-76 (1994); (g) allow the court to consider hearsay evidence in its post-sentencing report, O'Dell v. Commonwealth, 234 Va. 672, 701-02, 364 S.E.2d 491, 507-08 (1988); and (h) fail to provide meaningful appellate review, Satcher, 244 Va. at 228, 421

S.E.2d at 826.  See generally Breard, 248 Va. at 75-76, 445 S.E.2d at 675.

(3)  denying the defendant's motion for additional peremptory challenges.  See Green, 266 Va. at 107, 580 S.E.2d at 849; Spencer, 240 Va. at 84, 393 S.E.2d at 613; Buchanan v. Commonwealth, 238 Va. 389, 405, 384 S.E.2d 757, 767 (1989); O'Dell, 234 Va. at 690, 364 S.E.2d at 501.

(4)  refusing the defendant's request to use a juror questionnaire.  See Green, 266 Va. at 95-96, 580 S.E.2d at 842-43; Strickler, 241 Va. at 492-93, 404 S.E.2d at 234.

## ISSUES NOT PRESERVED

### A.  Change of Venue

Jackson, in his second assignment of error, charges that the trial court erroneously denied his motion for change of venue.  The Commonwealth argues that Jackson has waived this assignment of error because he neither renewed the motion at the time the jury was selected nor objected to the seating of the panel.

In Green, we stated that when a change of venue motion is taken under advisement or continued until the jury is empaneled, it is incumbent on the party seeking a change of venue to renew the motion or otherwise bring it to the court's

6

attention.  Green, 266 Va. at 94-95, 580 S.E.2d at 842.

Failure to do so implies acquiescence in the jury panel and is

tantamount to waiver of the motion for change of venue.  Id.

In this case, the trial court denied Jackson's motion for

a change of venue in a pre-trial hearing but stated that the

motion was "a continuing motion as we go through this

process."  Jackson did not seek a ruling on this "continuing

motion," did not bring the matter to the trial court's

attention, and made no objection based on venue before the

trial court empaneled the jury.  Accordingly, Jackson has

waived this assignment of error, and we will not address his

claims that the trial court erred by refusing to grant his

motion for a change of venue.  Id.; Rule 5:25.

### B.  Admission of Photographs

Jackson's eighth assignment of error challenges the trial

court's refusal to limit the presentation of crime scene and

autopsy photographs of the decedent.  Jackson argues here that

the gruesome content of the photographs served merely to shock

and inflame the jury, and, because Jackson had stipulated to

an autopsy report and diagrams indicating the manner of Mrs.

Kaiser's death, the fourteen photographs introduced by the

Commonwealth were cumulative and had no probative value.  The

Commonwealth argues that Jackson has waived this claim because

he did not object to the admission of the photographs at trial.

In a pre-trial motion, Jackson sought to limit the number of photographs depicting the condition of the decedent that could be introduced at trial, arguing that the photographs were cumulative. The trial court agreed that it would not admit cumulative evidence but denied Jackson's motion as premature because the Commonwealth had not yet determined which photographs it would introduce at trial. When the Commonwealth introduced all fourteen photographs as evidence, Jackson did not object. Jackson's failure to renew his objection at that time precludes him from raising this issue on appeal. Rule 5:25.

### C. Trial Court's Proportionality Review

Jackson asserts that the trial court erred in not examining whether the jury's verdict imposing the penalty of death was based on passion or prejudice and whether the punishment was disproportionate in this case pursuant to Code § 17.1-313. While we note that Code § 17.1-313 does not require such a review by the trial court, Green, 266 Va. at 107, 580 S.E.2d at 849, Jackson neither asked the trial court to conduct such a review nor addressed such review by the trial court on brief or in oral argument in this Court.

8

Accordingly, Jackson has waived this assignment of error. Rule 5:25.

## PRE-TRIAL

### A. Motion to Suppress

In his first assignment of error, Jackson asserts that the trial court erred in failing to suppress the confession Jackson made to the Newport News police officers while detained in the King George County Jail. Jackson asserts that the confession should have been suppressed because he did not knowingly and intelligently waive his constitutional rights to counsel and against self-incrimination and because the confession itself was not given voluntarily.

Longstanding principles of federal constitutional law require that a suspect be informed of his constitutional rights to the assistance of counsel and against self-incrimination. Miranda v. Arizona, 384 U.S. 436, 471 (1966). These rights can be waived by the suspect if the waiver is made knowingly and intelligently. Id. at 475. The Commonwealth bears the burden of showing a knowing and intelligent waiver. Id. Whether the waiver was made knowingly and intelligently is a question of fact that will not be set aside on appeal unless plainly wrong. Harrison v. Commonwealth, 244 Va. 576, 581, 423 S.E.2d 160, 163 (1992).

9

At the suppression hearing, Detective Larry P. Rilee testified that he informed Jackson of his Miranda rights when he began questioning Jackson at the King George County Jail around 2:50 p.m. on August 29 and that Jackson orally waived those rights at that time. Detective Rilee began taping the interrogation about 25 minutes later. The transcript of the taped portion of the interrogation recites that Detective Rilee stated, "We've advised you of your Miranda Rights, you understood those is that correct?" Jackson responded, "That's correct." Following this exchange, Jackson made a statement confessing to the murder of Mrs. Kaiser.

Jackson asserts that because Detective Rilee did not use a written waiver of rights form and did not repeat the elements of the Miranda warning during the taped portion of the interrogation, the record is insufficient to show that Jackson intelligently and knowingly waived his Miranda rights. We disagree.

A valid waiver of Miranda rights does not require the waiver to be in writing. Harrison, 244 Va. at 583, 423 S.E.2d at 163. Detective Rilee's testimony and the transcript of the interrogation support the trial court's factual determination that Jackson was informed of his Miranda rights and that he knowingly and intelligently waived those rights.

Jackson also contends that his confession was not voluntary because it was not the product of his free and unconstrained will.  Whether a confession was voluntary is a legal question to be resolved by the court, considering all the circumstances.  Roach v. Commonwealth, 251 Va. 324, 341, 468 S.E.2d 98, 108 (1996).

Jackson maintains that the officers conducting the interrogation overbore his will.  The police officers, according to Jackson, applied psychological pressure and engaged in trickery, and lied to him about the evidence connecting him with Mrs. Kaiser's death.  These actions along with his conditions of confinement resulted in a confession that, he argues, he did not voluntarily make.  We disagree with Jackson.

Jackson recites a number of factors that, he argues, rendered his statement involuntary.  Prior to and during his interrogation, he was tired, hungry, and kept in a "freezing" cell.  According to his court-appointed expert psychologist, Dr. Stephen C. Ganderson, the verbal performance component of Jackson's IQ was below average although his overall IQ was in the normal range.  Jackson further maintains that he was told that if he made a statement he could call his mother, and he stated that the promise was the reason he gave the statement confessing to the murder.

11

We agree with the trial court that neither the expert testimony nor the adverse conditions Jackson alleged constituted sufficient evidence that Jackson suffered from an impaired ability to understand what he was doing or saying, or that his ability to decide whether to give a statement of his own free will was overcome.  As noted by the trial court, the degree of detail in Jackson's confession belies his assertion that he only gave the statement to secure the right to telephone his mother.

The interrogation methods used by the officers in this case do not render this confession involuntary per se.  Smith v. Commonwealth, 219 Va. 455, 470, 248 S.E.2d 135, 144-45 (1978).  Furthermore, the record shows that Jackson did not cite police trickery or deceit as a ground for suppressing his confession in the trial court.  Jackson has not preserved that argument for consideration here.  Rule 5:25.

Based on our review of the record, we hold that Jackson confessed voluntarily and that the trial court did not err in concluding that Jackson knowingly and intelligently waived his Miranda rights.

### B.  Polling Jurors

In a pre-trial motion, Jackson asked that, if the jury imposed the death sentence based on the aggravating factor of vileness, the jury be polled as to "which statutory element(s)

12

established vileness, specifying at the time of polling one or more of torture, depravity of mind or aggravated battery."  To that end, Jackson requested jury instructions and a verdict form that required unanimity on one or more vileness elements. Relying on Richardson v. United States, 526 U.S. 813 (1999), Jackson argues that when imposing the death sentence, due process requires unanimity not only as to the aggravating factor of vileness but also to one or more of its composite elements.

This Court has rejected the proposition that the jury must identify the element or elements of the vileness factor upon which it based its decision.  Clark v. Commonwealth, 220 Va. 201, 213, 257 S.E.2d 784, 791 (1979).  The Supreme Court's decision in Richardson does not require us to revisit our decision in Clark.

Richardson involved a prosecution for engaging in a continuing criminal enterprise.  As relevant here, conviction required proof that the defendant committed a specific federal offense and that the offense was part of a "continuing series" of offenses undertaken by the defendant in concert with five or more other persons.  The trial court instructed the jury that it had to find unanimously that the defendant committed at least three federal narcotics offenses but did not have to agree as to the particular three offenses.  The Supreme Court

13

reversed, holding that the several violations required for conviction were an element of the offense and thus the jury had to agree on the same three violations.  Richardson, 526 U.S. at 819-20, 824.

The Supreme Court explained in Richardson that, for example, the jury must unanimously find force as an element of the crime of robbery, but whether the force is created by the use of a gun or a knife is not an element of the crime and therefore does not require jury unanimity.  Id. at 817.  In this case, the element the jury was required to find unanimously to impose the death sentence was the aggravating factor of vileness, which requires the defendant's actions be "outrageously or wantonly vile, horrible or inhuman."  Code § 19.2-264.2.  Depravity of mind, aggravated battery, and torture are not discrete elements of vileness that would require separate proof but rather are "several possible sets of underlying facts [that] make up [the] particular element." Richardson, 526 U.S. at 817.  Neither Clark nor Richardson, therefore, requires juror unanimity on these points.

Accordingly, we reject this assignment of error.

GUILT PHASE

A.   Juror Disqualification

Jackson charges that the trial court erred in not striking Sandra Peiffer from the jury panel for cause.

Absent manifest error, we will not disturb the trial court's judgment whether to strike a potential juror for cause. Green, 266 Va. at 98, 580 S.E.2d at 844; Clagett v. Commonwealth, 252 Va. 79, 90, 472 S.E.2d 263, 269 (1996). The law does not require that a juror be ignorant of all facts, only that jurors be impartial. Breeden v. Commonwealth, 217 Va. 297, 300, 227 S.E.2d 734, 736 (1976).

During voir dire, Peiffer volunteered that she had read newspaper accounts about the case and remembered that the person charged with the crime had made some comments to the newspaper earlier. Peiffer did not remember the name of the person. She went on to say, however, that she had not formed an opinion on the defendant's guilt and repeated that she would decide the case based on the evidence produced at trial.

Because the person interviewed by the media was Dorsett and not Jackson, Jackson maintained that Peiffer could not be impartial and would taint the jury if she told them her recollections of the newspaper account. The trial court refused to strike Peiffer for cause, finding that the juror was "very, very emphatic" about her ability to decide the case solely on the law and on the evidence.

Peiffer's statements, taken as a whole, demonstrate that she would be impartial in deciding the case. We find no error in the trial court's decision not to strike Peiffer for cause.

15

## B.   Batson Challenge

In Batson v. Kentucky, 476 U.S. 79, 89 (1986), the United States Supreme Court held that excluding a potential juror solely on the basis of the juror's race is purposeful discrimination and a violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. In his tenth assignment of error, Jackson claims that the trial court erred in rejecting his claim that the Commonwealth violated the rule in Batson because the Commonwealth exercised all five of its peremptory strikes against African-Americans.

When a defendant raises a challenge based on Batson, he must make a prima facie showing that the peremptory strike was made on racial grounds.  At that point, the burden shifts to the prosecution to produce race-neutral explanations for striking the juror.  The defendant may then provide reasons why the prosecution's explanations were pretextual and the strikes were discriminatory regardless of the prosecution's stated explanations.  Whether the defendant has carried his burden of proving purposeful discrimination in the selection of the jury is then a matter to be decided by the trial court. The trial court's findings will be reversed only if they are clearly erroneous.  Buck v. Commonwealth, 247 Va. 449, 450-51, 443 S.E.2d 414, 415 (1994).

In this case, the Commonwealth offered the following explanations for the exercise of its peremptory strikes against five African-Americans:

(1)  The Commonwealth struck Charles Blanco because he was previously represented by one of the defense attorneys and would be more likely to believe that attorney.  Mr. Blanco also was concerned about the impact of the trial on his responsibility to take care of his children who had special needs.

(2)  Amy Leggett was struck because she answered that she did not believe in the death penalty and even though she said she could apply it, "she would have a very, very hard time in applying the laws and evidence."

(3)  Vento Carter, according to the Commonwealth, changed his position throughout his voir dire, stating initially he would impose a higher standard of proof on the Commonwealth but then stating that he could nevertheless listen to the instructions of the court on the Commonwealth's burden.  Carter also changed his position with regard to the necessity of the defendant testifying.  The Commonwealth stated it had no "faith" in Carter's final answers.

(4)  The Commonwealth struck Geraldine Thomas because she stated that she would have to have "no doubt" as to the guilt of the defendant before imposing the death penalty regardless of what the court said.

(5)  Christopher Sledge testified that he would hold the Commonwealth to a higher standard even though he supposed he could follow the court's instructions. Sledge also stated that he "didn't like" the death penalty.

17

The trial court concluded that these explanations were race-neutral and rejected Jackson's <u>Batson</u> challenge.[1]

On appellate review, the trial court's conclusion regarding whether reasons given for the strikes are race-neutral is entitled to great deference, and that determination will not be reversed on appeal unless it is clearly erroneous. <u>Wright v. Commonwealth</u>, 245 Va. 177, 186, 427 S.E.2d 379, 386 (1993), <u>vacated and remanded on other grounds</u>, 572 U.S. 1217 (1994).

The trial court has the unique opportunity to observe the demeanor and credibility of potential jurors during <u>voir</u> <u>dire</u>, and the record supports the Commonwealth's characterization of the statements made by the potential jurors in question. Based on our review of the record, we conclude that the trial court's ruling on Jackson's <u>Batson</u> challenge was not clearly erroneous.

### C.  <u>Question Regarding Failure to Cooperate</u>

Jackson complains that the trial court improperly allowed the Commonwealth to cross-examine his court-appointed DNA expert, Shawn Weiss, regarding the witness' refusal to meet with the Commonwealth's DNA expert.

---

[1] Jackson did not assert that these answers were pretextual.

In his direct testimony, Weiss testified that he did not conduct independent testing of the DNA samples but questioned the Commonwealth's testing results in a number of areas. During cross-examination, Weiss acknowledged that the Commonwealth had attempted to set up a meeting between Weiss and the Commonwealth's DNA experts to "talk about" and "look at each other's calculations." The Commonwealth then asked Weiss why he had not agreed to the meeting. Weiss replied that he was "under the direction of the person that hired [him]." The Commonwealth went on to ask if Weiss knew that the Commonwealth had "just opened everything up, showed it, no requests having been made." At this point Jackson objected, saying that the Commonwealth's questioning implied that "somehow we weren't following the rules." The trial court overruled the objection.

Jackson argues here that the Commonwealth's questioning misled the jury because it implied that Jackson did not adhere to the rules of discovery.[2] The Commonwealth responds, that by asking the reasons for Weiss' refusal to meet with the Commonwealth's DNA experts, it was exploring Weiss' credibility, potential bias and the basis of his opinions.

_____

[2] Jackson also asserts that the exchange violated his constitutional rights of due process. He did not make this argument in the trial court and we do not consider it here. Rule 5:25.

19

Cross-examination of a witness to establish or explore the bias of that witness based on a relationship to a party in the case is proper. Goins v. Commonwealth, 251 Va. 442, 465, 470 S.E.2d 114, 129 (1996). Furthermore, limitation of cross-examination is within the trial court's discretion. Norfolk & Western Railway Co. v. Sonney, 236 Va. 482, 488, 374 S.E.2d 71, 74 (1988). In this case Weiss' statement that he refused to meet with the Commonwealth's DNA experts because of his relationship to the defense could have reflected bias. Accordingly, we cannot say that the trial court erred in overruling Jackson's objection to the Commonwealth's question.

### D. Expert Testimony on False Confessions

Jackson argues in his fourteenth assignment of error that the trial court incorrectly barred Jackson from asking his expert witness, Dr. Steven C. Ganderson, "a hypothetical question about false confessions."[3] While the trial court was willing to permit Dr. Ganderson to testify generally regarding circumstances that could lead to false confessions, it forbade Dr. Ganderson from testifying about the truth or falsity of Jackson's statement. We find no error in the trial court's ruling.

---

[3] Jackson does not isolate any specific question in his brief.

The physical and psychological environment surrounding a confession can be very relevant in determining whether a confession is reliable, and expert witnesses may testify "to a witness's or defendant's mental disorder and the hypothetical effect of that disorder." Pritchett v. Commonwealth, 263 Va. 182, 187, 557 S.E.2d 205, 208 (2002). Expert witnesses may not, however, render an opinion on the defendant's veracity or reliability of a confession because whether a confession is reliable is a matter in the jury's exclusive province. Id.

During voir dire, the trial court accepted Dr. Ganderson as an expert on psychology and sexual-psychological issues. Jackson elicited testimony from the doctor on the factors that contribute to "transference," a phenomenon in which a subject becomes more prone to suggestion and may say things which are untrue in an attempt to gain approval from an authority figure. Dr. Ganderson also testified about antecedents and objective goals of a defendant that could affect the reliability of a defendant's statements. While the trial court permitted this questioning, it sustained the Commonwealth's objection when Dr. Ganderson questioned the veracity of Jackson's statement based on transference theory. The trial court, relying on our decision in Pritchett, ruled that Dr. Ganderson could testify regarding the circumstances surrounding Jackson's confession but not about its truth:

Now, I still think in terms out of what he can't say, that's a false confession. I think the jury still has to make those kinds of conclusions. Those are factual conclusions, but he can testify about the surroundings and what he believes the impact has on this defendant with his mental capacity as well as the surroundings of the circumstances out of which the confession was taken.

There is no error in this holding.

### E. Negative Evidence of Reputation

Jackson asserts that the trial court erred in "preventing Jackson from presenting certain so-called 'negative' evidence of good character." Jackson refers specifically to the testimony of two individuals he called as character witnesses. Jackson asked the witnesses if they were aware of or had heard that Jackson had a reputation in the community for being violent. The Commonwealth objected, stating that before asking a question of this sort, Jackson had to establish that the witness was aware of Jackson's reputation in the community. The trial court sustained the objections.

This assignment of error is without merit. Jackson was not prohibited from presenting negative evidence of good character. Negative evidence of good character is based on the theory that a person has a good reputation if that reputation has not been questioned. Zirkle v. Commonwealth, 189 Va. 862, 871-72, 55 S.E.2d 24, 29-30 (1949). It is admissible, as is other reputation evidence, if the proper

22

foundation is established.  See Barlow v. Commonwealth, 224
Va. 338, 340-41, 297 S.E.2d 645, 646 (1982).  Thus, a witness
must be aware of the party's reputation in the community
before he may testify as to the lack of any reputation for a
particular characteristic.

Jackson did not establish that either witness had
knowledge of Jackson's reputation in the community before
asking the type of question recited above.  Accordingly, the
trial court not only was correct in sustaining the
Commonwealth's objection to the questions, but nothing in the
record shows that Jackson was prevented from introducing
negative evidence of reputation.  In fact, the record shows
that in at least one instance, Jackson proceeded to establish
that the witness had the requisite knowledge of Jackson's
reputation in the community and then testified that he never
"heard anything from anybody of [Jackson] doing any wrongdoing
to anybody."  We find no error in the ruling of the trial
court.

### F.  Motion to Strike

Jackson asserts that the trial court erred in denying his
motion to strike the Commonwealth's evidence.  He argues that
the evidence was insufficient to support his convictions
because his confession was not reliable, the forensic testing

23

was inadequate, and no other evidence connected him to the crime scene.

In reviewing the record to determine whether the evidence was sufficient to support the convictions, we consider the evidence in the light most favorable to the Commonwealth and give the Commonwealth all inferences fairly deducible from that evidence. Burns v. Commonwealth, 261 Va. 307, 313-14, 541 S.E.2d 872, 878 (2001).

Jackson argues that his confession was not reliable for two reasons: his will was overborne by the deception of the officers and the confession was false. We have already held that Jackson's will was not overborne, and, therefore, we reject that argument as a basis for finding his confession unreliable.

Jackson also bases his assertion that his confession was false on the alleged deception of the officers during his interrogation. Jackson does not offer, and we cannot find, any rationale or evidence supporting the conclusion that the tactics utilized by the officers during his interrogation caused Jackson's confession to be false.

The forensic testing was inadequate, according to Jackson, because the DNA testing of the blood mixture on the toe of a sock found at the crime scene involved only eight loci. Jackson's DNA loci matched six of the eight loci. The

24

standard procedure of the state laboratory is to test 13 or 16 loci. Shawn Weiss, Jackson's expert in DNA testing, testified that, had 13 or 16 loci been tested, there was a "possibility" that other suspects may have had more loci matches than Jackson.

Jackson's criticism of the Commonwealth's forensic testing does not change the fact that some of the loci matched his DNA. Under these circumstances, as his own expert testified, "Kent Jackson cannot be excluded as a minor contributor."

Finally, the lack of other forensic evidence connecting Jackson to the crime scene does not support the conclusion that the evidence was insufficient to prove Jackson's guilt beyond a reasonable doubt. Jackson's detailed confession, corroborated by evidence of the injuries Mrs. Kaiser suffered, was sufficient to establish his guilt beyond a reasonable doubt. The trial court did not err in denying Jackson's motion to strike. Clozza v. Commonwealth, 228 Va. 124, 133, 321 S.E.2d 273, 279 (1984).

STATUTORY REVIEW

Under Code § 17.1-313(C)(1), we must inquire whether passion, prejudice, or any other arbitrary factor affected the sentencing decision. Jackson contends that "numerous horrific photographs of the decendant" inflamed the jury and improperly

25

influenced its sentencing decision.  Jackson's argument is not, and cannot be, that allowing the pictures to be seen by the jury was error.  As discussed above, he did not object to their introduction during the guilt phase of the trial.  Thus, whether the pictures were properly or improperly admitted is not the issue before us in this statutory review.  We do however, consider the potential impact these pictures may have had on the decision to impose the death sentence.  Emmett v. Commonwealth, 264 Va. 364, 371, 569 S.E.2d 39, 44 (2002).

The pictures at issue, while gruesome, accurately depicted the condition of the victim and were relevant to the "motive, intent, method, malice, premeditation and the atrociousness of the crime."  Id. at 372, 569 S.E.2d at 45.  In this context, the jury was entitled to use the photographs to make an informed decision on the defendant's guilt and the appropriate sentence thereafter.  The record contains ample evidence supporting the imposition of the death sentence, and nothing in the record suggests that passion or prejudice played any part in that decision.

Code § 17.1-313(C)(2) requires us to determine whether the sentence in this case is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."  Our examination seeks "to reach a reasoned judgment regarding what cases justify the imposition

26

of the death penalty." Orbe v. Commonwealth, 258 Va. 390, 405, 519 S.E.2d 808, 817 (1999).

We have examined the capital murder cases where robbery was the predicate offense and where the Commonwealth sought the death penalty based on the aggravating factor of vileness. Our review encompassed both cases where the jury fixed the death penalty and where it fixed life imprisonment. Based on that review, we find that defendant's sentence was not excessive or disproportionate to sentences imposed in capital murder cases similar to the instant case. See Bennett v. Commonwealth, 236 Va. 448, 374 S.E.2d 303 (1988) (defendant bound, beat, and stabbed victim); Boggs v. Commonwealth, 229 Va. 501, 331 S.E.2d 407 (1985) (defendant beat his 87-year-old neighbor with a piece of steel and then stabbed her); Bunch v. Commonwealth, 225 Va. 423, 304 S.E.2d 271 (1983)(defendant shot his lover in the head, ransacked her house, and hung her from a doorknob); LeVasseur v. Commonwealth, 225 Va. 564, 304 S.E.2d 644 (1983) (defendant beat victim and stabbed her with a carving fork and ice pick); Whitley v. Commonwealth, 223 Va. 66, 286 S.E.2d 162 (1982) (defendant strangled victim, cut her throat, and inserted umbrellas into her anus and vagina post-mortem); Coppola v. Commonwealth, 220 Va. 243, 257 S.E.2d 797 (1979) (defendant entered house with co-conspirators, robbed victim, and then choked and beat her to death).

At oral argument, Jackson's counsel argued that the death penalty should not be imposed in this case because Jackson himself did not commit some of the more heinous acts involved in the murder of Mrs. Kaiser, but rather primarily assumed the role of a bystander and only stabbed Mrs. Kaiser with a knife. Counsel asked this Court to set aside the death penalty and impose a penalty of life pursuant to the provisions of Code § 17.1-313(D)(2).

We reject this request. Beulah Mae Kaiser suffered a brutal, vicious, and painful death at Kent Jermaine Jackson's hands. The record indicates that Jackson agreed to the plan to enter Mrs. Kaiser's apartment and rob her and that he kicked her and held her down while Dorsett punched, kicked, and stabbed her. Jackson stabbed Mrs. Kaiser and he handed Dorsett the cane that ultimately was shoved through her face.

For the above reasons we affirm the conviction for capital murder and the imposition of the death penalty entered in Case No. 030749 and affirm the non-capital convictions in Case No. 030750.

Record No. 030749 - <u>Affirmed.</u>
Record No. 030750 - <u>Affirmed.</u>