COURT OF APPEALS OF VIRGINIA

**PUBLISHED**

Present: Judges Malveaux, Bernhard and Senior Judge Humphreys
Argued at Virginia Beach, Virginia


CORY BIGSBY, S/K/A
 CORY JAMAR BIGSBY

v.     Record No. 1122-24-1

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE ROBERT J. HUMPHREYS
DECEMBER 30, 2025

FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
James C. Hawks, Judge Designate

Charles E. Haden for appellant.

Mason D. Williams, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


A jury convicted Cory Bigsby of second-degree murder and concealing the dead body of his

four-year-old son, C.B. The circuit court sentenced Bigsby to 45 years of imprisonment. Bigsby

challenges the sufficiency of the evidence to sustain his convictions. He also contends that the

circuit court erred in denying his challenges under *Batson v. Kentucky*, 476 U.S. 79 (1986), to the

Commonwealth's exercise of three peremptory strikes of potential jurors. Finally, he argues the

circuit court erred in refusing to strike four members of the jury panel for cause.

BACKGROUND

"Consistent with the standard of review when a criminal appellant challenges the

sufficiency of the evidence, we recite the evidence below 'in the "light most favorable" to the

Commonwealth, the prevailing party in the trial court.'" *Hammer v. Commonwealth*, 74

Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). This

standard "requires us to 'discard the evidence of the accused in conflict with that of the

Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

## I. Trial Evidence

During a long-term romantic relationship, Dina Abdul Kareem and Bigsby had four sons together: D.B, born on December 24, 2016; C.B., born on January 12, 2018; and twins Co.B. and Ca.B., born on June 14, 2019. Kareem and Bigsby broke up in December 2019, and she took the four children to live with her in Washington, D.C.[1]

In November 2020, the four children went to live with Bigsby in Hampton because Kareem was experiencing health issues. Kareem did not have Bigsby's address in Hampton and did not know where he lived; she communicated with him by email. Bigsby isolated the children from their mother and allowed her to speak with them only on their birthdays. She tried several times each month to contact the boys without success. Kareem received photos of the children from Bigsby only on their birthdays.

On April 8, 2021, Bigsby sent Kareem messages that he caught C.B. "fondling" the twins. Bigsby said that D.B. also had seen C.B. doing this. Bigsby stated that he planned to return C.B. to Kareem by the end of the month. Bigsby wrote, "I do not want to severely hurt him to protect my babies." Kareem did not speak to C.B. after receiving Bigsby's email. The last photo Kareem received that included C.B. was taken on the twins' birthday on June 14, 2021.[2]

---

[1] Bigsby, who was then living in Hampton, sought custody of D.B. and Co.B., but he eventually dropped the custody proceeding.

[2] A later search of Bigsby's cell phone revealed no original photographs including C.B. that were taken after June 2021.

On January 31, 2022, Bigsby reported to the Hampton police that C.B. was missing. When the police notified Kareem about the report, she told them about Bigsby's prior threat to harm C.B.

When the police responded to Bigsby's home on January 31, 2022, the two-story apartment was messy and had a "pungent smell." The apartment had a front door and a back sliding glass door; the blinds on the back door were closed. The police found two sets of adult-sized footprints in the snow outside the back door.

Bigsby reported that C.B. had awakened at 1:00 a.m. the night before, but went back to sleep in an upstairs bedroom. Bigsby also told police that he had last seen C.B. at about 2:00 a.m. when the child had awakened and wanted to go outside. Bigsby claimed that he got up at 7:00 a.m. that day and went downstairs to fix breakfast for the twins. When he went upstairs for a coat, he noticed that C.B. was missing. Bigsby said he found that the front door was unlocked, and mentioned that the lock on the sliding glass back door was broken. Bigsby claimed that he had reported the broken lock to the apartment maintenance office several times.[3] Bigsby gave the police a jacket he claimed C.B. had worn, and the police collected a pillowcase from the bed where Bigsby said C.B. had slept.

The police conducted exhaustive searches of the apartment and nearby areas, but did not find C.B. or any evidence of his disappearance. The police deployed tracking dogs in the area to locate C.B. using the scent from the jacket and pillowcase, but found no trace of him. A dog trained to detect human remains searched the exterior of the apartment and the surrounding area and found nothing. The police found some rancid meat in a small refrigerator in the home, but

_____

[3] The property manager testified that she had not been advised of any problem with the sliding glass door lock. She examined the lock and found it operational a few weeks after Bigsby reported C.B. missing and after the police concluded their investigation at the apartment. As a failsafe, the door also was equipped with a stick placed at the slide track at the bottom of the door.

- 3 -

the dog did not alert to indicate it was human remains. However, the cadaver dog alerted in the apartment in an upstairs bedroom along a wall.

D.B., who was seven years old at the time of Bigsby's trial in 2024, testified that when he lived with Bigsby, his father often spanked C.B. and put him "on punishment." D.B. said that he was four years old when he last saw C.B. At that time, D.B. found C.B. in an upstairs bedroom in the apartment; D.B. shook C.B. four times, called out his name, and tried to awaken him, but C.B. did not move or respond. D.B noticed that C.B.'s face was red and bruised. D.B. went downstairs and told Bigsby about C.B.'s condition. After awakening his twin brothers, D.B. returned upstairs to C.B. D.B. tried again to awaken C.B. but could not, and D.B. thought that C.B. was dead. C.B.'s eyes were open, but D.B. could not tell if he was breathing. D.B. sought out Bigsby and asked what was wrong with C.B. Bigsby responded that "nothing was wrong with" C.B.

Days after Bigsby reported C.B. missing, the police arrested him on multiple charges of child abuse and neglect. Bigsby was incarcerated at the Hampton Roads Regional Jail on August 4, 2022. From his cell, Bigsby called out to Corrections Officer Jemal Massey, who was on duty that day during the early morning hours. Bigsby asked Officer Massey to write down something for him. After hearing Bigsby speak a few sentences, and believing that Bigsby was making a confession, Officer Massey ran to the door of his cell to listen more closely and write down what he said.

In the statement that followed, Bigsby said that he had found his son unresponsive and attempted CPR, but had been unable to revive him. After praying, Bigsby tried again to revive his son. Realizing that his son "was not coming back," he put the body in a trash bag and left it in his car for three to five days. Bigsby said he went to a building at "Gary Morgan Boulevard

5511" and buried his son. He also "got rid of items" and "sanitized the wood line." Bigsby signed the statement that Officer Massey wrote for him.

Officer Massey contacted his supervisor and reported that Bigsby had just confessed. Lieutenant Katrina Evans then went to Bigsby's cell and gave him a pen and paper to record what he had told Officer Massey. Bigsby wrote that after stepping outside of his apartment, he returned to find C.B. unresponsive at the bottom of the apartment steps. Bigsby said that he attempted CPR but could not revive the child. After praying outside the apartment, Bigsby returned and attempted CPR again. Bigsby wrote that he put the body in a trash bag and placed it in his truck. He took C.B. to "Garrett A. Morgan Boulevard" and, after initially putting the body in a trash can, buried him in a hole beside a tree. At the time there was tape around C.B.'s ankles and wrists, "a cowboys rug [was] under him," and there were "beats headphones in his ears." Bigsby then "ate and placed his bike and some trash after I ate, at the scene." Bigsby signed the statement in Lieutenant Evans's presence.

Acting on the information in Bigsby's statements, the police went to the vicinity of FedEx Field in Maryland. Bigsby had worked in that area previously. Although Garrett A. Morgan Boulevard existed, there was no building numbered 5511. Using cadaver dogs, the police searched areas consistent with what Bigsby had described in his statements. None of the dog teams that searched the vicinity of FedEx Field found anything related to C.B.'s disappearance.

On December 25, 2022, a jail officer retrieved a writing that Bigsby had placed in the food tray slot to his cell. The writing, postdated January 8, 2023, restated that Bigsby attempted CPR on C.B., transported the body to Garrett A. Morgan Boulevard, and buried him there. The writing concluded that Bigsby was "becoming tired of torture so now I am confessing." C.B.'s body had not been found as of the date of the trial in this case.

In an inventory of Bigsby's cell conducted that same day, correction officers found a notebook containing a writing dated November 5, 2022. The writing recited:

> On 18 June 2021, I Cory Bigsby walked in the room and grabbed [C.B.] and drag [sic] him into the kitchen and thumped his head on the floor and beat him with my fist and he went into cardiac arrest and I tried to perform CPR. Then he did not respond. Then I went upstairs with [C.B.] and I put him into the tub. Then I wet him up to see if he would respond. He did not so I held him and prayed to God that he bring my baby back. Then I took him in the room and layed [sic] him on the bed. Then I went to the car and got a flashlight and charged it. I then went to the gas station and got gas. Then I went to the store and got snacks. Then I went to the restroom and pooped and wiped it on [C.B.] and I went to the empty car wash and put [C.B.] in a bag. Then I drove back home and put [C.B.] in the fridge. Then I put [C.B.] in the car again and drove him to Bldg 5511 and dug a hole by the tree and buried him. Then went home and prayed for forgiveness. Then went to King's Dominion the next day and I went to the hospital and I dumped my clothes from the crime in the trash and burned them. Then the next day, I went back to burn [C.B.] and cover up scars from beatings. Then I went home and took a bath with DJ. Please except [sic] my confession. Sincerely, Cory Bigsby[.]

## II. Jury Selection

### A. Motions to Strike Jurors 2, 10, 15, and 18 for Cause

#### 1. Juror 2

During voir dire, Juror 2 indicated that she lived within a two-mile radius of the Hampton apartment where Bigsby had lived with his sons. She had read media reports about the case, but had not formed any opinions about it. After C.B.'s disappearance, she followed social media posts about the incident because she hoped the child would be found. But she had not participated in any of the searches for C.B. From what she read at the time, she believed that the child's dead body had been found, but based on what she heard in court that day she realized that the body had not been found. Juror 2 stated, "My mind is still very open. I have also read that it was possibly the kids and not the father. So my mind is very open to whatever." She was "very

confident" that she could be a fair and impartial juror and said that she did not always believe the media.

Juror 2 said that she had been abused as a child and reported it to law enforcement, but the police did not believe her allegation and the culprit was never charged. She said she was not biased against the police as a result of the experience, but would be "willing" and "open" to listening to the testimony of the child witness who had been mentioned during voir dire. Regarding a potential child witness, Juror 2 said, "I would naturally take it more into consideration, but not naturally truly believe them."

Bigsby moved to strike Juror 2 following her individual voir dire. He asserted that she had said she would give a child's testimony "more consideration," and thus indicated she was not impartial. The circuit court observed that Juror 2 had "said because of her experience, of having been ignored in the past, she wasn't going to ignore any child witness," but "she didn't say that she necessarily would accept it over a police officer's testimony." The circuit court denied the motion to strike Juror 2 for cause.

2. Juror 10

Juror 10 lived within the same zip code as Bigsby's former apartment and knew "the area very well." He had not participated in the search for C.B. He had seen and heard media coverage of the case, and had discussed the child's disappearance with others, but had formed no opinions about the case. He believed that he could put the things he had seen or read aside and sit as an impartial juror. Then, upon specific individual questioning by the prosecutor, Juror 10 said he had seen the Commonwealth's Attorney at community events, but had not interacted with him about the case.

Bigsby moved for a mistrial because Juror 10 had not revealed his familiarity with the Commonwealth's Attorney until prompted by the prosecutor. After the circuit court denied the

motion for a mistrial, Bigsby moved to strike Juror 10 for cause because he had not been truthful about knowing the prosecutor. The prosecutor stated he had no relationship with Juror 10 but they had "seen each other in a civic situation."[4] The circuit court concluded that the Commonwealth's Attorney and the juror may have attended the same function, but there "was no exchange of information" or "[a]nything of that sort." Denying the motion to strike for cause, the circuit court found that Juror 10 did not demonstrate "any prejudice whatsoever" and appeared "open minded" and impartial.

### 3. Juror 15

Juror 15 indicated that he had seen local news broadcasts concerning C.B.'s disappearance, but he had formed no opinions and had no bias on the matter. He had heard that C.B. was missing and surmised that the child was dead, but said that he could set aside that belief. He had discussed C.B.'s disappearance at his workplace, but those conversations did not affect his ability to sit as an impartial juror. Juror 15 affirmed that he had no opinion about the case and could make his decision solely upon the evidence presented at trial.[5]

Bigsby moved to strike Juror 15 for cause based on his previously formed opinion that C.B. was dead. The circuit court observed that Juror 15 appeared to be "a man of principle" and had honestly admitted his previous opinion that C.B. was dead. The circuit court accepted the juror's statement that he could set that belief aside, keep an open mind, and decide the case based on the trial evidence. The circuit court denied the motion to strike Juror 15 for cause.

---

[4] Questioned further by the circuit court during the second day of jury selection, the prosecutor confirmed that the function he and Juror 10 attended was unrelated to Bigsby's case.

[5] Juror 15 also said that he harbored no bias against law enforcement based on his son's prosecution in Norfolk on a gun charge. Although he was employed as a school security officer, Juror 15 did not respond when the defense asked if anyone "related" to the jurors worked in law enforcement.

### 4. Juror 18

Juror 18 indicated he knew nothing about the case from media reports or any other source. He had two grandchildren of similar age as C.B., but was confident that would not affect his decision in the case. Juror 18 said that he was 62 years old, but did not recall whether he had completed a juror questionnaire before trial.

Bigsby moved to strike Juror 18 for cause because he did not "have the type of memory" needed for the case. The circuit court denied the motion.

### B. *Batson* Challenges to Jurors 19, 23, and 50

During voir dire of the jury panel, Juror 19 indicated he knew nothing about the case from media reports. Juror 19 was not questioned individually on voir dire.

Juror 23 stated that he had seen and heard news coverage concerning C.B.'s disappearance, but not about the police investigation. He had formed no biases or opinions about the case. Juror 23 said he had a grandchild who was three or four years old, but stated that factor would not affect his decision in the case. He indicated he had a coworker who was prosecuted for murder and convicted in Newport News, but that would not affect his ability to serve on the jury impartially. When asked if he or a member of his family was a victim of a violent crime, Juror 23 said yes but did not elaborate.

Juror 50 indicated that serving on the jury would be a hardship because she was a retired registered nurse and provided home healthcare for her sister who had just had major back surgery with later complications. She was her sister's sole caretaker and needed to be available to change her sister's dressings in the coming days. She thought she could make other arrangements for her sister's immediate needs, but her sister's situation would weigh on her mind and potentially prove distracting.

After the parties exercised their peremptory strikes, Bigsby objected to the Commonwealth's strikes of Jurors 19, 23, and 50. He argued that the strikes of the jurors—all of whom were Black—were racially motivated.

In response, the Commonwealth asserted that it struck Juror 19 because he was inattentive "throughout the entire proceedings" of voir dire. In addition, Juror 19 was unresponsive when asked for input. The circuit court found the prosecutor's explanation credible and rejected the *Batson* claim as to Juror 19.

The prosecutor explained that he struck Juror 50 out of concern that her attention would not be on the court proceedings due to her sister's health situation. Juror 50 was the primary caretaker for her sister, who was then recovering from surgery. The circuit court found the explanation "legitimate" and that there was no *Batson* violation when the Commonwealth struck her.

Finally, although the Commonwealth initially questioned whether Juror 23 was Black, the prosecutor said he struck the juror because he had a coworker who had been convicted for murder. In addition, Juror 23 himself had been a victim of crime. The circuit court accepted the Commonwealth's explanation as "valid" and denied the *Batson* motion as to Juror 23.

The jury convicted Bigsby for second-degree murder of C.B. and concealment of a dead body. Bigsby appeals.

ANALYSIS

I. Sufficiency of the Evidence

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)

(quoting Code § 8.01-680). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)).

The only relevant question for this Court on review "is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

The jury convicted Bigsby for second-degree murder and concealing C.B.'s dead body. "Second-degree murder . . . is defined as a malicious killing." *Woods v. Commonwealth*, 66 Va. App. 123, 131 (2016); *see* Code § 18.2-32. "Any person who transports, secretes, conceals or alters a dead body . . . with malicious intent and to prevent detection of an unlawful act or to prevent the detection of the death or the manner or cause of death is guilty of a Class 6 felony." Code § 18.2-323.02. Virginia courts have "long defined malice as 'the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will.'" *Shaw v. Commonwealth*, 304 Va. 217, 231 (2025) (quoting *Watson-Scott v. Commonwealth*, 298 Va. 251, 255-56 (2019)).

Presumably relying on the absence of C.B.'s body for forensic examination as to the cause of death, Bigsby challenges the sufficiency of the evidence to sustain his convictions for the two offenses. Bigsby argues, in general terms, that the Commonwealth failed to prove that he killed C.B. and concealed his body. He asserts that the Commonwealth "merely adduced

- 11 -

evidence of suspicious circumstances combined with a great deal of surmise and conjecture." Given the abundant evidence of Bigsby's guilt in the record before us, we reject his contentions.

To begin, in several different statements Bigsby confessed to crimes relating to C.B.'s death and disappearance. He admitted that on June 18, 2021, he beat C.B. until the child "went into cardiac arrest." He asserted that he tried to revive C.B. with CPR and water, but was unsuccessful. Bigsby did not seek medical attention for the child. Instead, he charged a flashlight, put gas in his vehicle, bought snacks, wiped C.B. with feces, and put C.B.'s body in a bag at a car wash. Bigsby hid C.B.'s body in the refrigerator of the family's apartment. At some point later, Bigsby drove C.B.'s body to a building he identified as "5511" and buried him nearby. After a visit to an amusement park the next day, Bigsby disposed of his "clothes from the crime" and burned them. Bigsby returned to C.B.'s grave to burn him "and cover up scars from beatings." Bigsby's own volunteered statements thus proved that he maliciously killed C.B. and hid his body to prevent detection of the child's death.

In Virginia, it is well-established that proof of the corpus delicti, that a crime actually occurred, is essential to any criminal prosecution. *See Allen v. Commonwealth*, 287 Va. 68, 74 (2014). Under the corpus delicti rule, "an accused cannot be convicted solely on his uncorroborated extrajudicial admission or confession." *Id.* (quoting *Watkins v. Commonwealth*, 238 Va. 341, 348 (1989)). But the Commonwealth need provide only "*slight corroboration* of the confession [to prove] beyond a reasonable doubt" that the crime was committed. *Id.* (quoting *Cherrix v. Commonwealth*, 257 Va. 292, 305 (1999)). That corroboration can come from circumstantial or direct evidence. *See Watkins*, 238 Va. at 349. The corroborative evidence is sufficient if, "when taken with the evidence of the confession, it proves the commission of a crime beyond a reasonable doubt." *Morning v. Commonwealth*, 37 Va. App. 679, 685 (2002). In determining the sufficiency of the corroboration, inferences drawn from proven facts "are

- 12 -

within the province of the trier of fact so long as the inferences are reasonable and justified." *Id.* at 687.

The record in this case provides ample evidence to corroborate Bigsby's confessions and prove the corpus delicti of the offenses. After assuming physical custody of the children in November 2020, Bigsby kept them isolated at his apartment in Hampton, allowing them only very limited contact with their mother. In April 2021, Bigsby emailed Kareem expressing anger at C.B. and threatening the child with violence. Bigsby alleged that C.B. was fondling the twins, and stated that he intended to return C.B. to her to prevent him from "severely hurt[ing] him to protect" the younger children. After receiving a photo of C.B. taken on June 14, 2021, just days before Bigsby admitted that he killed the child, Kareem never saw or heard from C.B. again. Bigsby's phone contained no original photographs of C.B. taken after that date, a circumstance tending to show that the child was no longer living with him.

D.B was four years old when he saw C.B. for the last time in an upstairs bedroom in the apartment. Noting that C.B.'s face was red and bruised, he was unresponsive, and his eyes were open, D.B. believed his brother was dead. But when he reported this to his father, Bigsby responded that nothing was wrong with C.B.

Bigsby contacted the police in January 2022 and said C.B was missing; he claimed to have seen the child in the early morning hours that day, but awakened later and discovered him gone. Trained police canines searched the home and the vicinity using the scent items Bigsby provided, but they found no trace of the child. Yet, a cadaver dog alerted for the presence of human remains near the wall of an upstairs bedroom in Bigsby's apartment, consistent with D.B.'s account of his final sighting of C.B. In addition, corroborating Bigsby's description of his systematic efforts to conceal and dispose of C.B.'s dead body—hiding it in a trash bag in his truck and then the refrigerator, burying it, and returning later to burn it to hide evidence of past

- 13 -

physical abuse—the child's remains were never found. *See Clozza v. Commonwealth*, 228 Va. 124, 133 (1984) (noting that the lack of semen in any body cavity corroborated the defendant's "statement that he ejaculated on the ground"). In sum, the evidence was sufficient for a reasonable fact finder to conclude beyond a reasonable doubt that Bigsby maliciously beat and killed C.B., disposed of his body, and lied about it afterward. We find no basis to disturb the jury's verdict.

## II. *Batson* Claims

"[A] defendant [has] the right to be tried by a jury whose members are selected pursuant to non-discriminatory criteria." *Batson*, 476 U.S. at 85-86. The Equal Protection Clause forbids peremptory exclusion of potential jurors solely because of their race. *See id.* at 89. *Batson* articulated a three-step test by which the validity of a peremptory challenge may be assessed. *See Jackson v. Commonwealth*, 266 Va. 423, 436 (2003). First, when a defendant raises a challenge based on *Batson*, he "must make out a prima facie case" that the peremptory strike was made on racial grounds. *Bethea v. Commonwealth*, 297 Va. 730, 748 (2019) (quoting *Johnson v. California*, 545 U.S. 162, 168 (2005)). Second, "the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes."[6] *Id.* (quoting *Johnson*, 545 U.S. at 168). "The defendant may then provide reasons why the prosecution's explanations were pretextual and the strikes were discriminatory regardless of the prosecution's stated explanations." *Jackson*, 266 Va. at 436. Finally, "if a race-neutral explanation is tendered, the trial court must then decide whether the opponent of the strike has proved purposeful racial discrimination." *Bethea*, 297 Va. at 748. "Under each of *Batson*'s three steps, . . . the 'burden of persuasion "rests with, and never shifts from, the

_____

[6] We note that where, as here, the Commonwealth sua sponte offered its reasons for its peremptory strikes, an appellate court "need not consider whether [the defendant] established a *prima facie* showing of discrimination." *Buck v. Commonwealth*, 247 Va. 449, 451 (1994).

- 14 -

opponent of the strike.""" *Lightfoot v. Commonwealth*, 50 Va. App. 723, 727 (2007) (en banc) (quoting *Johnson*, 545 U.S. at 171).

Bigsby asserts that the Commonwealth's stated reasons for striking Jurors 19, 23, and 50 were "inadequate" and pretextual; he maintains that the strikes were discriminatory. After Bigsby raised his *Batson* motion, the prosecutor stated his reasons for striking Jurors 19, 23, and 50. The circuit court credited those explanations and denied the *Batson* motion for each of the three jurors. Defense counsel noted an exception to the trial court's ruling but made no response to the prosecutor's stated reasons for the exercise of peremptory challenges regarding the three jurors.

"*Batson* places upon *the trial courts* the burden of weighing the explanations tendered by [attorneys] justifying their use of peremptory strikes, assessing their genuineness, and determining whether they bespeak discriminatory motives." *Stevens v. Commonwealth*, 70 Va. App. 280, 305 (2019) (alteration in original) (quoting *Winfield v. Commonwealth*, 12 Va. App. 446, 453 (1991)). "The 'trial court has a pivotal role in evaluating . . . not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike." *Id.* at 302 (alteration in original) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008)). "[T]he issue of whether a defendant establishes purposeful discrimination 'turns on factual determinations.'" *Id.* (quoting *Foster v. Chatman*, 578 U.S. 488, 500 (2016)). "Appellate courts must thus give '[d]eference to trial court findings on the issue of discriminatory intent . . . because, as [was] noted in *Batson*, the finding "largely will turn on evaluation of credibility.""" *Id.* at 305 (alterations in original) (quoting *Hernandez v. New York*, 500 U.S. 352, 365 (1991)). "This Court cannot and should not substitute its judgment for that of the trial court when the issue rests so heavily upon direct observation and a determination of credibility." *Id.* at 306. In summary, unless the record

reflects clear and undisputed evidence to the contrary, a trial court's factual finding that a peremptory challenge was exercised for a neutral or non-discriminatory reason is binding on this Court on appeal.

Here, the circuit court credited the prosecutor's race-neutral explanations for striking the three jurors. The prosecutor stated that he struck the jurors based on inattentiveness during the voir dire process, the potential inability to focus on the trial rather than extraneous concerns, and the likelihood of bias due to a friend's conviction for one of the crimes with which Bigsby was charged. The record contains no evidence that the prosecutor's stated reasons were pretextual.[7] Granting appropriate deference to the trial court's credibility determinations, we find no basis to disturb its denial of Bigsby's *Batson* challenges.

### III. Denial of Motions to Strike Jurors for Cause

"The right to be tried by an impartial jury is guaranteed under both the United States and Virginia Constitutions." *Taylor v. Commonwealth*, 61 Va. App. 13, 22 (2012); *see also* Code § 8.01-358. "For that guarantee to be effective, persons accused of violating criminal laws must be provided with 'an impartial jury drawn from a panel . . . free from exceptions.'" *Taylor*, 61 Va. App. at 22 (quoting *Breeden v. Commonwealth*, 217 Va. 297, 300 (1976)). "Every prospective juror must stand indifferent to the cause, 'and any reasonable doubt as to a juror's

---

[7] The record is largely silent on the overall racial composition of the venire. In argument on his *Batson* motion, defense counsel asserted that the circuit court had struck four Black members of the venire for cause. In addition, although the record does not reflect that the circuit court found that defense counsel satisfied its burden of persuasion regarding the first part of the so-called *Batson* test—that the defendant had established a prima facie pattern of a discriminatory basis for the Commonwealth's exercise of its peremptory challenges—we assume without deciding that Bigsby did so. *See Foster*, 578 U.S. at 499 ("First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination." (quoting *Snyder*, 552 U.S. at 476-77)).

qualifications must be resolved in favor of the accused.'" *Id.* at 23 (quoting *Breeden*, 217 Va. at 298). "If there be a reasonable doubt whether the juror possesses these qualifications, that doubt is sufficient to insure his exclusion." *Id.* (quoting *Breeden*, 217 Va. at 298). "These principles must be strictly applied, and when a prospective juror equivocates about whether he or she has formed a fixed opinion, the prospective juror should be stricken by the trial court." *Id.*

"Juror impartiality is a question of fact." *Goodwin v. Commonwealth*, 71 Va. App. 125, 136 (2019). "When an appellate court reviews a decision to deny a motion to strike a prospective juror for cause, the Court 'must give deference to the trial court's decision whether to exclude or retain a prospective juror because the trial court "sees and hears the juror."'" *Id.* (quoting *Weeks v. Commonwealth*, 248 Va. 460, 475 (1994)). "[I]n assessing a juror's impartiality, the appellate court reviews the *voir dire* of each juror as a whole, not just isolated statements by that juror." *Id.* "Finally, a trial court's refusal to strike a juror for cause will not be disturbed on appeal unless that decision constitutes 'manifest error amounting to an abuse of discretion.'" *Id.* (quoting *Lovos-Rivas v. Commonwealth*, 58 Va. App. 55, 61 (2011)).

Bigsby contends that the circuit court erred in denying his motions to strike Jurors 2, 10, 15, and 18 for cause. Other than reciting the arguments that defense counsel made in the trial court, Bigsby asserts only that "the trial court's failure to resolve doubts about the venire persons in favor of the accused constitutes reversible error." He presents no argument on brief to explain why the trial court's decisions were erroneous. The record does not support that contention.

"The opinion entertained by a juror, which disqualifies him, is an opinion of that fixed character which repels the presumption of innocence in a criminal case, and in whose mind the accused stands condemned already." *Taylor*, 61 Va. App. at 23 (quoting *Lovos-Rivas*, 58 Va. App. at 61). Accordingly, "the test of impartiality is whether the venireperson can lay aside

the preconceived views and render a verdict based solely on the law and evidence presented at trial. *Id.* (quoting *Lovos-Rivas*, 58 Va. App. at 61).

As the circuit court observed, Juror 2 was unequivocal that she could serve fairly and impartially, and reach her decision based on all the evidence at trial, notwithstanding her childhood allegation of abuse that law enforcement apparently did not credit. Bigsby's reason for striking Juror 10—that he was acquainted with the Commonwealth's Attorney and did not volunteer that information—did not tend to prove that he had a preconceived opinion of the case that he could not disregard. The circuit court observed that Juror 15 honestly admitted having an earlier opinion that C.B. was dead but credited the juror's statement that he could set that assumption aside, keep an open mind, and decide the case based on the trial evidence. Finally, we find no basis to conclude that Juror 18's inability to remember whether he completed a juror questionnaire had any bearing on his ability to serve as an impartial juror. Deferring to the trial court's factual findings, and considering its ability to observe the demeanor of the jurors, we find no abuse of the circuit court's discretion in concluding that Jurors 2, 10, 15, and 18 were impartial and denying Bigsby's motions to strike them for cause.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court.

*Affirmed.*